**MISSISSIPPI GAY ALLIANCE and Anne DeBary, Plaintiffs-Appellants,**

v.

**Bill GOUDELOCK et al., Defendants-Appellees.**

No. 74–4035.

United States Court of Appeals, Fifth Circuit.

Aug. 12, 1976.

Rehearing and Rehearing En Banc Denied Oct. 13, 1976.

Mark Shenfield, Jackson, Miss., Melvin L. Wulf, New York City, for plaintiffs-appellants.

A. F. Summer, Atty. Gen., William A. Allain, Asst. Atty. Gen., Ed Davis Noble, Jr., Sp. Asst. Atty. Gen., Jackson, Miss., for defendants-appellees.

Travis H. Clark, Jr., Greenwood, Miss., for Bill Goudelock.

Before GEWIN, COLEMAN and GOLD-BERG, Circuit Judges.

COLEMAN, Circuit Judge.

This is not the ordinarily encountered First Amendment case in which a university student newspaper seeks to set aside an order directing it *not* to publish something which it wishes to publish.

To the contrary, it is a case in which a nebulous group, the Mississippi Gay Alliance, representing itself to be an association "basically comprised of homosexuals", seeks judicial compulsion against a student newspaper requiring publication of an advertisement which that paper does not want to publish.

The District Court refused to command publication. We affirm.

On August 16, 1973, a female, the self-styled chairwoman of the Mississippi Gay Alliance, presented a proposed paid advertisement to *The Reflector,* the student newspaper at Mississippi State University.

The proposed advertisement read as follows:

"Gay Center — open 6:00 to 9:00 Monday, Wednesday and Friday nights.
"We offer — counselling, *legal aid* and a library of homosexual literature. (Emphasis added).
"Write to — The Mississippi Gay Alliance P. O. Box 1328 Mississippi State University, Ms. 39762."

The editor of the student newspaper refused to accept the tendered paid advertisement.

On February 8, 1974, the same person presented an announcement to be printed in the "briefs" section of *The Reflector.* This, too, was rejected. The content of that announcement does not appear in the record.

Whereupon, suit was filed against the editor and others, alleging that the refusal to print the paid advertisement and announcement deprived the Gay Alliance of its First Amendment rights and praying that the defendants be ordered to print the rejected material. The suit also sought an order requiring defendants to print future advertisements and announcements tendered by the Gay Alliance. Actual and punitive damages were also demanded.

The parties agreed to stipulations, which might be summarized as follows:

1. The named plaintiffs are not MSU students nor is the MGA a recognized student organization.

2. No member of the MGA was enrolled as an MSU student.

[This second stipulation was, at plaintiff's request, modified by court order in December, 1974, after the district court's ruling was issued. The new stipulation apparently says that some members of the MGA were MSU students. This modification did not affect the ruling of the district court].

3. The MSU student body elected Bill Goudelock as editor of *The Reflector.*

4. Funds supporting *The Reflector* are derived at least in part from a non-waivable fee charged to students at MSU.

5. [University officials] Giles, Meyer, and Dudley did not give Goudelock any instructions not to accept the proffered material.

The trial court reviewed these facts, and determined that there were four issues in the case: (1) whether plaintiffs had standing to sue; (2) whether plaintiffs' unclean hands precluded the possibility of the court granting them the equitable relief they sought; (3) whether there was state action on the part of the defendant to support this § 1983 action; and (4) whether the First Amendment protection that covers a student newspaper meant that plaintiffs had no cause of action against Goudelock.

Deciding nothing with reference to the first two points, the District Court found, on the complaint and the stipulated facts, that there was no *indication* that any University official or faculty member had anything to do with the rejection of the advertisement or the announcement; that there was a complete lack of control over the student newspaper on the part of University officials.

The Court concluded that the rejection of the advertisement "does not constitute state action in any sense of the term".

Relying on *Bazaar v. Fortune,* 5 Cir., 1973, 476 F.2d 570, affirmed as modified, 489 F.2d 225 (en banc) and *Miami Herald Publishing Company v. Tornillo,* 1974, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730, it was held that in the absence of state action the student newspaper editor could "accept or reject such material as he saw fit".

While it is true that the student newspaper is supported, in part, by activity fees collected by the University, the students elect the editor. The complaint did not allege and the stipulations did not assert that University officials supervise or control what is to be published or not published in the newspaper.

As a matter of fact, in the context of the matter before us, this Court has held that the University authorities could not have ordered the newspaper not to publish the Gay Alliance advertisement, had it chosen to do so, see *Bazaar v. Fortune, supra.*

▪ In *Miami Herald Publishing Company v. Tornillo, supra,* the Supreme Court flatly declared:

"The choice of material to go into a newspaper * * * constitute[s] the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time."

▪ Since there is not the slightest whisper that the University authorities had any-

thing to do with the rejection of this material offered by this off-campus cell of homosexuals, since such officials could not lawfully have done so, and since the record really suggests nothing but discretion exercised by an editor chosen by the student body, we think the First Amendment interdicts judicial interference with the editorial decision.

There are special reasons for holding that there was no abuse of discretion by the editor of *The Reflector.*

Hutchinson's Mississippi Code of 1848 included the following provision:

"Unnatural Intercourse; Punishment.

"Every person who shall be convicted of the detestable and abominable crime against nature, committed with mankind or a beast, shall be punished by imprisonment in the penitentiary for a term of not more than ten years." [1]

The exact language of this provision has been retained in the Code revisions of 1857, 1871, 1880, 1892, 1906, 1917, 1930, 1942, and 1972. [2]

The Mississippi statute condemns any intercourse which is unnatural, detestable and abominable, including acts committed per anus or per os, *State v. Davis,* 223 Miss. 862, 79 So.2d 452 (1955). This is not surprising. The very title of the statute shows it to have been directed against "Unnatural Intercourse".

The statute is not unconstitutional, *State v. Mays,* 329 So.2d 65 (Miss.1976). [3]

▪ The editor of *The Reflector* had a right to take the position that the newspaper would not be involved, even peripheral-

1. Chapter 64, Art. 12, Title 7(20).

2. The current statute is Section 97–29–59, Mississippi Code of 1972. For mention of the significance to be attached to the ancient origin of a similar statute in Virginia, see *Doe v. Commonwealth,* 403 F.Supp. 1199, 1202, 1203 (E.D.Va., 1975), Affirmed, —— U.S. ——, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), [44 U.S.L.W. 3543].

3. The Mississippi Supreme Court relied on the decision of the Supreme Court of the United States in *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). In *Rose,* a Tennessee statute prohibited "Crimes against nature, either with mankind or any beast". The Supreme Court, reversing the Sixth Circuit, held that interpreting the Tennessee statute to include cunnilingus did not render it unconstitutional. It cited, 96 S.Ct. at 245, *State v. Crawford,* 478 S.W.2d 314 (Mo.1972), which held that crime against nature embraces within its terms acts of sodomy, bestiality, buggery, fellatio, and cunnilingus.

ly, with this off-campus homosexually-related activity.[4]

The judgment of the District Court is AFFIRMED.

GOLDBERG, Circuit Judge (dissenting):

I respectfully dissent.

I understand the trial court and the majority of this panel to hold that the lack of direct involvement by university officials and the free expression rights of student editors combine to preclude any possible right of access to the *Reflector* on the part of the MGA. I disagree with that holding and, on the allegations, would find a narrowly circumscribed right of access which might extend to the MGA in this case.

The majority opinion here can be read as also deciding, in an alternative holding, that the advertisement tendered by the MGA was undeserving of any first amendment protection which might otherwise exist, because the ad might have "involved" the newspaper "with . . . off-campus homosexually-related activity." This latter holding, if indeed it is that, is clearly and absolutely wrong.

A proper disposition of this case requires that we balance the rights of speakers and hearers of "protected" speech against special considerations supporting student control over student publications. In order that my position on the narrow but important first amendment issues in this case might be fully understood, I find it necessary at this juncture to summarize briefly the course of this litigation. After reviewing the background, I will discuss what I consider to be an easy issue—whether the

MGA advertisement is "protected" speech. Finally, I will attempt to explain why I would reconcile the competing first amendment interests in a different fashion than did the trial court.

## I. FACTS AND PROCEDURAL BACKGROUND

In August, 1973, the Mississippi Gay Alliance (MGA),[1] through one of its officers, submitted the following paid advertisement to be placed in the *Reflector,* the student newspaper at Mississippi State University (MSU):

"Gay Center — open 6:00 to 9:00 Monday, Wednesday and Friday nights.

"We offer — counselling, legal aid and a library of homosexual literature.

"Write to — The Mississippi Gay Alliance P. O. Box 1328 Mississippi State University, Ms. 39762."

Bill Goudelock, then the student editor of the paper, refused to accept the tendered advertisement. According to the plaintiffs' allegations, the *Reflector* at that time printed paid and unpaid advertisements of commercial, political, social, religious and informative natures.

In February, 1974, the MGA presented an announcement (the contents of which are not in the record) to the *Reflector*, asking that it be placed in the "Briefs" section, wherein the paper regularly ran announcements of campus and local organizations free of charge. This was never printed. In March, 1974, the MGA and individual members of the MGA filed the instant suit, seeking to compel publication of their ads,

---

**4.** One may not be prosecuted for being a homosexual, but he may be prosecuted for the commission of homosexual acts. Taking into consideration the laws of Mississippi on the subject, speaking as only one member of the panel, Judge Coleman is of the opinion that *no* newspaper in the State may be required to advertise solicitations for homosexual contacts, any more than a paper could be expected to advertise solicitations for contacts with prostitutes. The advertisement tendered by the Gay Alliance offered *legal aid.* Such an offer is open to various interpretations, one of which is that

criminal activity is contemplated, necessitating the aid of counsel.

**1.** The complaint described the MGA as follows: The MGA is an association located in Starkville, Mississippi. Some of its members attend Mississippi State University. The purpose of the MGA is to provide a forum where ideas may be discussed, information disseminated, and members freely associate between themselves and their friends. The MGA membership is composed primarily of homosexuals.

and to obtain declaratory relief and damages. In addition to Goudelock the following were named as defendants: Henry F. Meyers, Faculty Adviser to the student paper; Sam Dudley, Chairman of the MSU communications department; and William L. Giles, President of MSU. After limited discovery by both sides, the three MSU defendants moved to dismiss on the grounds that plaintiffs lacked standing to sue, had acted in bad faith, and had unclean hands.

At a hearing on this motion, the trial court proposed a set of stipulated facts. After some negotiation, the parties agreed to the stipulations which are summarized in the majority opinion. As indicated in that opinion, the district court did not decide the issues of standing[2] and unclean hands.[3] Rather, the trial court dismissed the action

on the grounds now adopted by the panel here.

In determining the appropriate standard of review in this case, it should be noted that the exact nature of the procedural disposition by the lower court is uncertain. The ruling seems to say that no cause of action was stated, which would indicate dismissal under Fed.R.Civ.P. 12(b)6. On the other hand, the trial court's reliance on the stipulated facts suggests that the motion to dismiss was being treated as one for summary judgment (Rule 56 via Rule 12).

The MGA argues that if the latter analysis is accurate, the trial court erred in failing to follow the procedures set out in Rule 12 for converting the motion—the nonmoving party must be given a "reasonable opportunity to present all material made per-

2. The trial court considered standing to be an issue but pretermitted it to reach the substantive issues. In their brief, the MSU defendants-appellees argue standing at length, urging that because the MSU officials caused plaintiffs no direct injury, *i. e.*, because the officials were passive, plaintiffs do not have standing to sue these officials. This argument is unpersuasive. Plaintiffs have alleged a distinct injury (their ad was rejected) and have alleged a causal relationship between the action of Goudelock, the acquiescence of the MSU officials, and that injury. The most recent cases seem to treat standing as a preliminary determination looking to objective factors: Has plaintiff alleged 1) an injury which sets him apart from other interested citizens, and 2) some degree of responsibility on the part of the defendant for that injury? The purpose of this exercise is simply to assure the court that it will have a sincere contest—an actual "case or controversy"—and will not be called upon to render advisory opinions. *See generally Korioth v. Briscoe,* 5 Cir. 1975, 523 F.2d 1271. Plaintiffs' allegations here are sufficient to support their standing—whether they have stated a cause of action is another question.

3. Although the trial judge explicitly avoided reaching the issue, he did quote at length from letters written by plaintiff DeBary, and indicated a concern with the cleanliness *vel non* of the plaintiffs' hands. In one letter DeBary stated, *inter alia,* "the ad is really unimportant. It is being used as a tool to begin 'legal freedom' for gays in Mississippi." In another communication, DeBary stated, "we deliberately created a lawsuit for publicity and power. Really absurd, if you were one of the very few who knew

the real story. The officers of the MGA were, at best, only three people."

As a general rule, the determination of whether the "unclean hands" maxim should be applied to bar relief in a specific case is left in the first instance to the trial court. *See, e. g., United States v. Second Nat'l Bank of Miami,* 5 Cir. 1974, 502 F.2d 535; *Wolf v. Frank,* 5 Cir. 1973, 477 F.2d 467, *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218. Although it would thus be appropriate to leave this question to the trial court on remand, I feel constrained to note that the situation before us seems an unlikely one for the applicability of this equitable defense.

Claimants in equity who practice fraud, deceit, or the like, even if not to a degree sufficient to be held criminally or civilly liable, may in some situations properly be denied equitable relief. *See generally Munchak v. Cunningham,* 4 Cir. 1972, 457 F.2d 721; *Washington Capitols Basketball Club, Inc. v. Barry,* 9 Cir. 1969, 419 F.2d 472.

In this case, however, the evidence shows only that DeBary hoped to get some publicity from the suit and that she did not consider the nominal issue—whether the *Reflector* had the right to refuse her ad—as the overriding concern. No cases have been cited in which a claimant has been held to have "unclean hands" simply because she hoped that her suit would publicize a cause. I expect that much civil rights litigation might have been thwarted had such a rule been applied. The law is full of "test" cases which have determined important constitutional matters in seemingly minor disputes. I seriously doubt that the DeBary letters could justify a refusal to grant equitable relief on the basis of unclean hands.

tinent to such a motion by Rule 56." If the district court's view of the law is correct, however, the plaintiffs in effect had their "reasonable opportunity"—no material they could have presented could have changed the legal effect of the stipulated facts.

I think that it would be most appropriate to treat the disposition below as a summary judgment. The major issues before this court could then be stated as follows: 1) does there exist in any circumstances a constitutional right of access to the advertising and announcement sections of student newspapers at state universities? 2) If so, are there any factual questions in this case which, if resolved in favor of the plaintiffs, could lead to the conclusion that the plaintiffs were within the scope of such a right? If both questions are answered affirmatively, then summary judgment was improper, and, *a fortiori*, disposition under Rule 12(b)(6) would have been improper.

Before discussing those major issues, however, I will address the issue raised for the first time in the majority's apparent alternative holding—whether the MGA ad is "protected" speech.

## II. PROTECTED SPEECH

As I have indicated, the majority's discussion of "special reasons" justifying the student editor's refusal to accept this ad can be read as an implicit holding that the MGA ad was "unprotected" speech for first amendment purposes. Such a holding obviously

would be fallacious. If other local groups had a right of access to the *Reflector*, that right could not be denied the MGA in respect to the advertisement at issue here. The ad directly solicits nothing approaching criminal activity, and the publication of the ad would not involve the *Reflector*, "even peripherally," in the proscribed activities discussed in the majority opinion.

The advertisement simply sought to notify persons who were homosexuals, who were interested in the subject of homosexuality or who had problems relating to homosexuality that certain services were available to them at a "gay center." No statute, in Mississippi or in any relevant jurisdiction, makes criminal the status of being a homosexual.[4] Indeed, no statute could do that and survive constitutional challenge. See *Robinson v. California*, 1962, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758. On the face of it, none of the services listed in the advertisement could conceivably be characterized as illegal. The suggestion of Judge Coleman that the criminal taint in the ad is demonstrated by the offer of "legal aid" implies a presumption of illegality whenever lawyers are involved[5]—surely the level of respect for the profession has not reached this nadir.

Thus, the exception whereby statements which propose illegal transactions are rendered valueless for first amendment purposes cannot be applied to this advertisement.[6] Neither could the advertisement

**4.** *Doe v. Commonwealth*, E.D.Va.1975, 403 F.Supp. 1199 *aff'd*, 1976, —— U.S. ——, 96 S.Ct. 1489, 47 L.Ed.2d 751, and *Rose v. Locke*, 1975, 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185, relied on by the majority, dealt of course with proscribed acts (*Rose*, in fact, dealt with heterosexual acts). Cf. *Gay Students Organization v. Bonner*, 1 Cir. 1974, 509 F.2d 652; *Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation*, D.R.I.1976, 417 F. Supp. 632 [44 L.W. 2577, June 9, 1976]. *But cf. Gay Lib v. University of Missouri*, W.D.Mo. 1976, —— F.Supp. —— [45 L.W. 2051, June 29, 1976].

**5.** *See* note 4 of the majority opinion.

**6.** *Compare Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 1973, 413 U.S. 376, 384–86, 93 S.Ct. 2553, 37 L.Ed.2d 669 *and*

*United States v. Hunter*, 4 Cir. 1972, 459 F.2d 205, *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 *with Bigelow v. Virginia*, 1975, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 *and Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Counsel*, 1976, —— U.S. ——, 96 S.Ct. 1817, 48 L.Ed.2d 346.

Had the tendered ad expressly solicited "unnatural intercourse," or had the editor of the *Reflector* grounded his refusal to publish the ad on his knowledge that the "library of homosexual literature" contained obscene materials, I might well reach a different conclusion. Plainly, neither of these situations has been shown to exist in the case before us, so I remain convinced that the tendered advertisement should be accorded full first amendment protection.

even arguably be characterized as "unprotected" speech on any other ground. It is not "directed to inciting or producing imminent lawless action." [7] The ad could occasion no substantial disruption of classroom activity,[8] nor could it be construed as an "intolerable" invasion of a "substantial" privacy interest.[9] No basis exists for suggesting that the ad is libelous,[10] obscene [11] or "fighting words." [12] In short, nothing in the record contradicts the following statement of the trial court:

It is certainly true that this ad tendered by Anne DeBary appears quite innocuous on its face. It certainly would not be such matter that might be regarded as obscene, or, in the eyes of many people, offensive.[13]

The ad carried an informative statement with regard to a matter of social concern, and, as seen, its contents trigger none of the recognized exceptions to freedom of speech.

**7.** *Brandenburg v. Ohio*, 1969, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (per curiam):

[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

For an argument that the *Brandenburg* test should be applied to cases involving noncriminal sanctions, see Comment "Brandenburg: A Test For All Seasons?" 43 *U.Chi.L.Rev.* 151, 165–91 (1975).

**8.** *Tinker v. Des Moines Indep. School Dist.*, 1969, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731, suggests that student conduct in a high school that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Compare Blackwell v. Issaquena Co. Bd. of Educ.*, 5 Cir. 1966, 363 F.2d 749 *with Burnside v. Byars*, 5 Cir. 1966, 363 F.2d 744, 749.

The tradition of academic freedom and the greater maturity of students on a college campus suggest that courts should be particularly solicitous of first amendment rights in such a setting. The Supreme Court has made it clear, for example, that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Board of Curators of University of Missouri*, 1973, 410 U.S. 667, 670, 93 S.Ct. 1197, 1199, 35 L.Ed.2d 618; *see also Healy v. James*, 1972, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266. *But see Gay Lib v. University of Missouri*, W.D.Mo.1976, 416 F.Supp. 1350 [45 L.W. 2021, 1976] (a case which, in my opinion, cannot be reconciled with *Healy*).

**9.** *See Erznoznik v. City of Jacksonville*, 1975, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125; *Cohen v. California*, 1971, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284. Justice Stewart's description of the motion pictures at issue in *Young v. American Mini Theatres*, 1976, ——

U.S. ——, ——, 96 S.Ct. 2440, 49 L.Ed.2d 310 [44 U.S.L.W. 4999, 1976 (dissenting opinion), is obviously applicable to the MGA ad:

The kind of expression at issue here is no doubt objectionable to some, but that fact does not diminish its protected status any more than did the particular content of the "offensive" expression in *Erznoznik* . . . (display of nudity on a drive-in movie screen); *Lewis v. City of New Orleans*, 415 U.S. 130 [94 S.Ct. 970, 39 L.Ed.2d 214] (utterance of vulgar epithet); *Hess v. Indiana*, 414 U.S. 105 [94 S.Ct. 326, 38 L.Ed.2d 303] (utterance of vulgar remark); *Papish* . . . (indecent remarks in campus newspaper); *Cohen* . . . (wearing of clothing inscribed with a vulgar remark); *Brandenburg* . . . (utterance of racial slurs); or *Kingsley Pictures Corp. v. Regents*, 360 U.S. 684 [79 S.Ct. 1362, 3 L.Ed.2d 1512] (alluring portrayal of adultery as proper behavior).

**10.** "[T]here is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 1974, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789; 805; *cf. New York Times v. Sullivan*, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

**11.** *See Miller v. California*, 1973, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419; *Roth v. United States*, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. *Cf. Young v. American Mini Theatres, Inc.*, —— U.S. ——, 96 S.Ct. 2440, 49 L.Ed.2d 310 [44 U.S.L.W. 4999, 1976], discussed *infra* at note [24]; *Ginsberg v. New York*, 1968, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (upholding conviction for selling to minor magazines which were concededly not "obscene" if shown to adults).

**12.** Communications "which by their very utterance inflict injury" are constitutionally unprotected. *Chaplinsky v. New Hampshire*, 1942, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031.

**13.** I assume that the majority implicitly has held this finding by the trial court to be clearly erroneous.

Thus, this is not an "unnatural intercourse" case, and there exist no "special reasons" related to the content of the ad which would justify its discriminatory rejection in the face of a general right of nondiscriminatory access. I turn, then, to the difficult first amendment questions actually presented in this case.

## III. A CONSTITUTIONAL RIGHT OF ACCESS

The MGA's argument that it had a right of access to the advertising columns of the *Reflector* is based on the notion that when the state provides a communication forum generally open to the public, the state may not discriminatorily forbid the use of the forum by certain individuals because of the content of their proposed messages. After discussing the contours of this "public forum" doctrine as it might be applied to a state newspaper, I will address two separate questions which the trial court and the majority have commingled: 1) should the *Reflector* be viewed as a state newspaper?; 2) assuming that the *Reflector* engages in state action, do the free expression rights guaranteed to student editors preclude any

right of access on the part of outside groups? As will be seen, I conclude that on the basis of the allegations the advertising and announcement sections of the *Reflector* can be seen as a public forum to which the MGA might have a right of nondiscriminatory access.

### A. *Equal Access: State Newspapers as Public Forums.*

There is authority for the proposition that the first amendment's guarantee of free speech carries with it some requirement that the state provide "minimum access"—that is, that the state accommodate speakers' attempts to obtain access to listeners.[14] Freedom of association, as well as freedom of speech, supports such a requirement in some situations.[15]

Whatever the scope of the minimum access requirements of free speech, a narrower doctrine is well established in Supreme Court precedent—when the state has provided a public forum through which speakers might have access to listeners, the state cannot discriminate among potential speakers on the basis of the content of their

**14.** *See* Kalven, "The Concept of the Public Forum: *Cox v. Louisiana*," 1965 *Sup.Ct.Rev.* 1; Note, "The Public Forum: Minimum Access, Equal Access, and the First Amendment," 28 *Stan.L.Rev.* 117 (1975). For an example of a court's adoption and use of the minimum access view in the context of a nontraditional public forum, see *Albany Welfare Rights Organization v. Wyman*, 2 Cir. 1974, 493 F.2d 1319, *cert. denied*, 1976, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (absolute ban on leafleting in welfare office waiting room was unconstitutional abridgment of free speech).

**15.** There is right of the listener to protected speech that, in this case, coincides with the associational rights of some students. MGA asserts that some of its members are MSU students, and the amended stipulation apparently supports this. There may be other MSU students who are interested in attending MGA meetings or using MGA facilities. These and other readers of the *Reflector* have been denied information that may have been necessary or important to the full exercise of their first amendment rights freely to associate with others. It is not sufficient to suggest that other means of communicating the existence of their organization or the time and place of their meetings remain with the MGA, for the *Reflec-*

*tor* may be the cheapest, easiest, and most effective means of communicating with a specific audience. Particularly on a matter as personal as sexual preference, the reader may wish to preserve his or her anonymity, and his or her receipt of a widely distributed school paper may serve this need better than, say, attendance at an MGA speech on campus.

The guarantee to those interested in homosexuality of the right freely to associate with one another would be a hollow promise indeed unless they are also assured of equal, nondiscriminatory access to information relevant to their concerns. "[T]he central First Amendment concern remains the need to maintain free access of the public to the expression." *Young v. American Mini Theatres, Inc.*, 1976, — U.S. —, —, 96 S.Ct. 2440, 2455, 49 L.Ed.2d 310 [44 U.S.L.W. 4999, 5007, 1976] (Powell, J., concurring). "[T]his Court has referred to a First Amendment right to 'receive information and ideas, '. . . [F]reedom of speech ' "necessarily protects the right to receive." ' " *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 1976, — U.S. —, —, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346, 355.

message.[16] The notion that there must be equality of access to public forums is compelled not only by speech and associational rights, but also by the full force of the equal protection clause.

The Supreme Court expounded on equal access in *Police Dep't of Chicago v. Mosley,* 1972, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212:

. . . [A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. . . . To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." . . .

Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone and may not be justified by reference to content alone. [Citations and footnote omitted.]

The state, of course, has considerable discretion in reasonably regulating the time, place and manner in which speech may be made from various public forums.[17] What the state cannot do is to provide a forum through which some members of the public are able effectively to communicate their message to a certain audience while other members of the public are prohibited from utilizing the forum because of the content of their proposed messages.[18]

**16.** *See Police Dept. of Chicago v. Mosley,* 1972, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212, and cases there cited; *Southeastern Promotions, Ltd. v. City of West Palm Beach,* 5 Cir. 1972, 457 F.2d 1016. *See also* Karst, "Equality as a Central Principle in the First Amendment," 43 *U.Chi.L.Rev.* 20 (1975); *Kalven, supra* note 14; Stone, "Fora Americana: Speech in Public Places," 1974 *Sup.Ct.Rev.* 233; Note, *supra* note 14. First amendment protections, of course, are fully applicable against the states through the due process clause of the fourteenth amendment. *See, e. g., Bigelow v. Virginia,* 1975, 421 U.S. 809, 811, 95 S.Ct. 2222, 44 L.Ed.2d 600.

**17.** *See, e. g., Grayned v. City of Rockford,* 1972, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222, 232; *Kovacs v. Cooper,* 1949, 336 U.S. 77, 85–87, 69 S.Ct. 448, 452–454, 93 L.Ed. 513, 521–522.

**18.** The result in *Lehman v. City of Shaker Heights,* 1974, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770, seems to indicate a departure from the principle stated in text in that the Court there upheld a city transit system's refusal to permit political advertising within its vehi-cles, despite the acceptance of commercial ads by the transit system. A plurality opinion, for various reasons related to a city's operation of a bus system, tested the ordinance under a weak "rational relationship" standard. Justice Douglas' critical fifth vote, however, was placed solely on a concern for the "captive audience" in the city vehicles and he vehemently rejected any justification for the city's policy based on the content of the advertising messages. *Id.* at 304–309, 94 S.Ct. at 2717–20, 41 L.Ed. at 777–780.

The author of the *Lehman* plurality opinion (Justice Blackmun) apparently now regards the case as having turned on the captive audience concern. *See Southeastern Promotions, Ltd. v. Conrad,* 1975, 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448. Indeed, speaking for a majority of the Court, Justice Blackmun has approved the *Lehman* dissenters' rejection of any simplistic distinction between commercial and political advertising for purposes of the First Amendment. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 1976, —— U.S. ——, —— n.16, 96 S.Ct. 1817, 1824 n.16, 48 L.Ed.2d 346, 356 n.16.

Nothing in the case before us suggests any "captive audience" problem.

I take it to be quite clear, for example, that a city, having established a "speaker's corner" in a public park from which almost anyone might speak about almost anything, could not constitutionally prohibit speeches dealing non-obscenely with the topic of homosexuality.[19]

Taking the hypothetical a step closer to the instant case, we might posit a newspaper paid for and published by the state— call it the "Open Forum"—in which all citizens are invited to express their views on any issue, subject only to reasonable space limitations and a small fee to help offset printing costs. Could the "Open Forum" refuse to print a tendered statement on the ground that it expressed a political view contrary to that of the Governor, or on no stated ground at all? Surely not. Conceivably, the state could place many non-content-oriented restrictions on the form of the messages, but the state could not refuse tendered statements otherwise similar in form to those regularly accepted solely because the proffered ads were disagreeable in content.[20]

The conclusion I reach with regard to the "Open Forum" hypothetical finds support in the case law. In a case with striking similarities to the one before us, the Seventh Circuit held that a state university's campus newspaper which was open to commercial and some political and service advertisements could not constitutionally reject, be-

cause of editorial content, advertisements describing the purposes of a university employees' union, an advertisement proclaiming the immorality of racial discrimination, or advertisements pertaining to race relations and the Vietnam War. *Lee v. Board of Regents*, 7 Cir. 1971, 441 F.2d 1257, *aff'g*, 306 F.Supp. 1097. Indeed, the only potentially important distinction between *Lee* and the instant case is that in *Lee*, it was "conceded that the campus newspaper is a state facility." 441 F.2d at 1258. The rules under which the tendered advertisements were rejected had been promulgated by a faculty-student committee. 306 F.Supp. at 1099.

In *Zucker v. Panitz*, S.D.N.Y.1969, 299 F.Supp. 102, the district court reviewed a claim by high school students seeking to publish in the high school newspaper paid advertisements opposing the Vietnam War. The court found that the newspaper was "a forum for the dissemination of ideas," noting that other articles on the war and the draft had been published in the paper and that the paper was open to the free expression of ideas in news and editorial columns and in letters to the editor. Relying on *Tinker v. Des Moines Indep. Comm'ty School Dist.*, 1969, 393 U.S. 503, 503 S.Ct. 733, 21 L.Ed.2d 731, the district court enjoined the school officials from interfering with the right of students in the high school to place advertisements in the school newspaper.

---

**19.** This seems axiomatic from *Mosley*. (The implication of the "special reasons" portion of the majority opinion in this case is that the statement of law in the text is far from being "quite clear." With respect, I can only submit again that I think the majority is clearly wrong.)

Part III of the plurality opinion in *Young v. American Mini Theatres, Inc.*, 1976, —— U.S. ——, ——, 96 S.Ct. 2440, 49 L.Ed.2d 310 [44 U.S.L.W. 4999, 1976] suggests that *Mosley*'s statement on the prohibition of content discrimination should be read only in light of *Mosley*'s facts (involving an ordinance permitting labor picketing near a school but forbidding picketing on other issues). Justice Powell's fifth vote, however, was needed for the result in *Young* (upholding a zoning ordinance regulating locations of purveyors of "adult" but

non-obscene materials), and he explicitly disapproved of Part III of the plurality opinion. Id. at ——, n.1, 96 S.Ct. 2440 [44 U.S.L.W. at 5006 n.1]. The four dissenters apparently would read *Mosley* for all it seems to say. *Id.* —— U.S. at —— & n.2, 96 S.Ct. 2440 [44 U.S.L.W. at 5009 & n.2]. In these circumstances, I believe that for "equal access" purposes *Young* should be read as limited to the municipal zoning concerns expressed in Justice Powell's concurrence. ". . . [T]his situation is not analogous to cases involving expression in public forums or to those involving individual expression or, indeed, to any other prior case. . . ." Id. at ——, 96 S.Ct. at 2455 [44 U.S.L.W. at 5007] (Powell, J., concurring).

**20.** I will discuss in text *infra* the types of restrictions which might be permissible.

In *Radical Lawyers Caucus v. Pool*, W.D.
Tex.1970, 324 F.Supp. 268, Judge Roberts
held that the Texas Bar Journal, conceded
to be an agency of the state of Texas, was
prohibited by the first and fourteenth
amendments from refusing to accept an
advertisement publicizing an upcoming
meeting of the plaintiff organization. The
court disposed of the defendant's argument
that the Journal be permitted to refuse
"political and editorial" advertising so that
it might "maintain its neutrality in contro-
versial matters," by pointing to position-
taking political statements that had ap-
peared in the Journal. *Id.* at 270.

A "state" newspaper could not constitu-
tionally refuse advertisements advocating
one side of a public issue while accepting
advertisements advocating the other side.
No less offensive to the first and fourteenth
amendments should be a case in which ad-
vertisements dealing with public issues are
generally accepted, but advertisements on
certain public issues are selectively and ar-
bitrarily excluded.[21]

---

**21.** The Supreme Court has never passed on a
claim of equal access to a state publication.
The suggestion that the Court would recognize
the rights found in *Lee, Zucker* and *Radical
Lawyers* is not undermined by, and indeed re-
ceives implicit support from, *Columbia Broad-
casting System v. Democratic National Com-
mittee*, 1973, 412 U.S. 94, 93 S.Ct. 2080, 36
L.Ed.2d 772. This complex case prompted six
opinions, and its result—network broadcasters
are not required to accept paid political adver-
tising—must be seen as resting at least in part
on a feeling that the private broadcasters were
not the government for first amendment pur-
poses.

Arguably, the Court alternatively reached the
same result, 5–4, even under the assumption
that the broadcasters were engaged in govern-
mental action. This latter holding, I think,
must be seen as narrowly limited to the unique
characteristics of the regulated broadcast in-
dustry. *See Red Lion Broadcasting Co. v. FCC*,
1969, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d
371; Note, "The Supreme Court, 1972 Term,"
87 *Harv.L.Rev.* 57, 175 (1973). Compare *Red
Lion* with *Tornillo, supra* note 13. *See also
Mink v. Radio Station WHAR*, 1976 [FCC No.
76–529, 44 L.W. 2584, June 8, 1976].

Several statements by individual Justices in
*CBS* seem to indicate that if governmental ac-
tion were found, full rights of equal access
should apply. For example, the Chief Justice
stated:

Were we to read the First Amendment to
spell out governmental action in the circum-
stances presented here, few licensee deci-
sions on the content of broadcasts or the
processes of editorial evaluation would es-
cape constitutional scrutiny.

412 U.S. at 120, 93 S.Ct. at 2095, 36 L.Ed.2d at
793.

Justice Douglas rejected the notion that the
broadcasters engaged in governmental action.
He speculated on the effect of a contrary find-
ing as follows:

If these cases involved [the Corporation for
Public Broadcasting], we would have a situa-
tion comparable to that in which the United
States owns and manages a prestigious
newspaper like the New York Times, Wash-
ington Post, and Sacramento Bee. The
Government as owner and manager would
not, as I see it, be free to pick and choose
such news items as it desired. For by the
First Amendment it may not censor or enact
or enforce any other "law" abridging free-
dom of the press. Politics, ideological slants,
rightist or leftist tendencies could play no
part in its design of programs . . .
More specifically, the programs tendered by
the respondents in the present cases could
not then be turned down.

*Id.* at 149–50, 93 S.Ct. at 2109–10, 36 L.Ed.2d at
810.

As will be seen in my later discussion of the
scope of the right to access, the scope of the
right envisioned by Justice Douglas is broader
than that which I would find in relation to
student publications.

Justice Brennan, joined by Justice Marshall,
dissented in *CBS*. They felt that broadcast
licensees satisfied state-action criteria, and
thus they would have applied the public forum
doctrine:

. . . [T]here can be no doubt that the
broadcast frequencies allotted to the various
radio and television licensees constitute ap-
propriate "forums" for the discussion of con-
troversial issues of public importance. In-
deed, unlike the streets, parks, public librar-
ies and other "forums" that we have held to
be appropriate for the exercise of First
Amendment rights, the broadcast media are
dedicated *specifically* to communication.
And, since the expression of ideas—whether
political, commercial, musical or otherwise—
is the exclusive purpose of the broadcast
spectrum, it seems clear that the adoption of
a limited scheme of editorial advertising
would in no sense divert that spectrum from
its intended use.

*Id.* at 194–95, 93 S.Ct. at 2132–33, 36 L.Ed.2d at
836.

Were the *Reflector* clearly a paper run by and for the state, then, the allegations of the MGA (unaltered by the stipulated facts) that the paper regularly accepted paid and unpaid messages and announcements from other local groups would be sufficient to raise a genuine issue of material fact. If the allegations were true, the state would have denied the MGA equal access to a public forum.

On the other hand, if the *Reflector* were purely a private newspaper, there presumably would exist no such right of access. The editor of a private newspaper is constitutionally protected in a decision not to publish a political reply advertisement, even in the face of a state right to reply statute. See *Miami Herald Publishing Co. v. Tornillo*, 1974, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730. Clearly, then, a federal court would have no power, under statutes requiring "state action," to prohibit a non-state newspaper from exercising selective content discrimination in its publication of advertisements.[22]

The first question thus becomes whether the *Reflector* can be characterized as the state. Even if, under traditional analysis, "state action" is found, the court must proceed to the further question of whether the newspaper is, at least in part, a public forum. That question will require a review of special considerations relating to student newspapers, and a balancing of competing first amendment interests.

### B. *State Action.*

As indicated above, *Lee* and *Zucker* were not difficult cases with regard to the question of state action. It was clear in both that officials, not students, exercised ultimate responsibility for the censorship decision. Indeed, the student editors in *Zucker* were plaintiffs, seeking to compel publication of the advertisements. Although the students in *Lee* may have supported the

official rules and the specific decision not to publish, it was conceded that the censorship was the product of state action. In this case, by contrast, the university officials argue that they do not and indeed could not countermand specific editorial decisions of the student editor of the *Reflector*, and thus that the "state action" required to trigger the public forum doctrine is lacking. The trial court and the majority here have agreed with this argument.

The absence of affirmative involvement by university officials in the decision to refuse the MGA ad should not end the state action inquiry. Were direct, active involvement by state officials to become a prerequisite for a state action finding, *Burton v. Wilmington Parking Authority*, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, and *Marsh v. Alabama*, 1946, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, would have to be overruled, and cases like *Hudgens v. N.L.R.B.*, 1976, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196; *Moose Lodge No. 107 v. Irvis*, 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, and *Golden v. Biscayne Bay Yacht Club*, 5 Cir. 1976, 530 F.2d 16 (en banc) would be very easy cases. State action, of course, is not so simple. A number of factors must be examined to determine if the action challenged as detrimental to individual rights should be considered to be state action for fourteenth amendment purposes. As Judge Coleman emphasized in *Golden*, the ultimate question is whether the facts establish "significant state involvement" in what otherwise may appear to be private activity. 530 F.2d at 19.

To my mind, the allegations of the MGA, if shown to be true, would establish that actions taken by the *Reflector*, as it deals with and appears to members of the public, should be considered to be state action. The complaint in this action set forth the following allegation:

> The Reflector is the official newspaper of MSU, a state supported and controlled

22. Cf. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 1973, 413 U.S. 376, 391, 93 S.Ct. 2553, 2562, 37 L.Ed.2d 669, 680:

[W]e affirm unequivocally the protection afforded to editorial judgment and to the free expression of views on these and other issues, however controversial.

institution of higher learning. The major portion of the Reflector's financing comes from the Student Activity Fund which is collected by MSU and disbursed to the Reflector. The Reflector is printed on MSU facilities and it is an organ of MSU. The stipulations included the fact that funds supporting *The Reflector* were derived from a non-waivable fee charged to students at MSU.

The *Reflector's* funding is thus derived from what is in effect a tax charged by the state to the students.[23] The allegations suggest that the imprimatur of the state is clearly stamped on the paper. In these circumstances, I have little doubt that this court would review a decision by the students to exclude blacks from participation on the newspaper staff as a decision imbued with state action.[24] To my mind, the pure "state action" question should be the same in the first amendment context. *Cf. Golden, supra*, 530 F.2d at 19.

Having concluded, on the issue of "state action," that appellants are deserving of at least a remand,[25] I turn to what I consider the most significant question in this case: does the Constitution permit student editors of an official publication at a state university to pursue a general policy of accepting from local groups advertisements dealing with matters of public interest, but at the same time to exclude, because of its con-

tent, a certain advertisement proffered by a similarly situated group?

## C. *A Right to Edit.*

Clearly, student editors of a campus newspaper are protected by their own first amendment rights.[26] As the cases discussed below demonstrate, these rights include in some contexts the right to refuse to print as well as the right to print. The district court seems to have determined that these rights extend to provide complete student autonomy over all sections of the newspaper. Relying on this Circuit's decision in *Bazaar v. Fortune*,[27] and the Fourth Circuit's opinion in *Joyner v. Whiting*,[28] the trial judge concluded that student editor of *The Reflector* was protected in his decision to reject the MGA advertisement by the same protections which, in *Tornillo*, shielded the Miami Herald's decision not to run a reply to its editorial.

*Bazaar* held that, on the facts before it, state university officials could not censor the contents of a student literary magazine. The court rejected the defendants' argument that, because the magazine was published with the advice of the university's English department, the magazine would be identified as speaking for the university, which gave the defendants a right to censor. Neither was censorship justified on

23. For a consideration of the relationship between the fund supporting a student newspaper and the state in a very different context (the eleventh amendment), see *Schiff v. Williams*, 5 Cir. 1975, 519 F.2d 257. *Cf. Smith v. Doehler Metal Furniture Co.*, 1943, 195 Miss. 538, 15 So.2d 421; *Coleman v. Whipple*, 1941, 191 Miss. 287, 2 So.2d 566.

24. *See* Karst, *supra* note 16, at 46–47 & n. 137. *Cf. Joyner v. Whiting*, 4 Cir. 1972, 477 F.2d 456, 462–63 (question discussed but not decided); *Zucker v. Panitz*, S.D.N.Y.1969, 299 F.Supp. 102, 105 n. 4:
> Different policy considerations govern whether a privately owned newspaper has affirmative duty to grant access to its pages, and whether a school newspaper has such a duty. For instance, there would be involved the thorny issue of finding state action, a problem which does not exist regarding a school newspaper.

25. The argument might be made that the stipulated funding arrangement in itself is enough upon which to base a state action finding. Appellants ask only for a remand on this issue, however. If facts were found on remand to establish public perception of the *Reflector* as the official campus newspaper, the state action determination could be made with more confidence.

26. "It can hardly be argued that either students or teachers shed their *constitutional rights* to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. School Dist.*, 1969, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731, 737.

27. 1973, 476 F.2d 570, *aff'd. as modified*, 1974, 489 F.2d 225 (en banc).

28. 1973, 477 F.2d 456.

the ground that four-letter words used in the objected to stories made them "too tasteless and inappropriate" to be connected with the university. Our *en banc* court modified *Bazaar* only by making explicit the university's right to print a disclaimer of official responsibility with the stories. 489 F.2d 225.[29]

*Joyner* held that a state university's withdrawal of financial support from the official newspaper, in response to the newspaper's segregationist editorial policy, abridged the freedom of press rights of the students. 477 F.2d at 460–62.[30]

These cases do not suggest that the *Reflector* should be thought of as something other than a state newspaper—indeed, they suggest the contrary. The rationale of *Bazaar* is expressly grounded on the "open forum" cases discussed in the preceding section. 476 F.2d at 575. Although *Joyner* invokes "freedom of the press", the result in that case is certainly consistent with public forum notions, and the *Joyner* court also relies on the open forum cases cited above. 477 F.2d at 460. *Bazaar* and *Joyner* indicate that state school officials, having provided a forum for free expression by students, cannot censor the content of the messages that the students seek to disseminate. That rule, on its face, would not be inconsistent with a requirement that the columns of the state-sponsored paper be open to anyone with anything to say. The *Joyner* court seemed to recognize this possibility:

> When a college paper receives a subsidy from the state, there are strong arguments for insisting that its columns be open to the expression of contrary views

and that its publication enhance, not inhibit, free speech.

477 F.2d at 462.

In my opinion, however, a requirement of wide-open access to the pages of a student newspaper would sweep much too broadly. To the extent that the right of student editors to free expression is to be protected, that right must include the right to edit. With limited space for news and editorial columns, and with attribution on the masthead as "editors," students operating a student paper must necessarily exercise some discretion in choosing what to publish and what not to publish. This is most clear, perhaps, when the materials to be edited are generated solely by the student staff, but the "right to edit" (based in part on the necessity for editing) would logically extend to articles or columns submitted by outside sources.

This principle is supported by *Joyner*'s reliance on a "freedom of the press" rationale, and by the Third Circuit's decision in *Avins v. Rutgers, State University of New Jersey*, 3 Cir. 1967, 385 F.2d 151, *cert. denied*, 1968, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982. *Rutgers* upheld the right of the student editors of a state university law review to reject a tendered article. The court stressed the impossibility and undesirability of a requirement that student editors publish every article submitted, and held that "the acceptance or rejection of articles submitted for publication in a law school law review necessarily involves the exercise of editorial judgment." 385 F.2d at 153. Both *Joyner* and *Rutgers* assumed without deciding that state action existed, but, nevertheless, *Joyner* held that the

---

**29.** The dissent from the *en banc* court's decision stressed the narrowness of the issues presented in *Bazaar*—whether the university must appear to have sponsored the offending publication. The dissent also noted that the university had admitted that it could not censor the student newspaper. 489 F.2d at 226–28. *Cf. Schiff v. Williams*, 5 Cir. 1975, 519 F.2d 257,

263 (Gee, J., specially concurring) (the *Bazaar* panel's view of the law was "scarcely unprecedented.")

**30.** The college involved in *Joyner* was predominantly black, the student newspaper staff was all black, and the offending editorials were "black power" in tone.

school officials could not censor the paper, and *Rutgers* held that an outside author could demand no right of access to the space allotted to outside articles.

I fully support the result in the *Rutgers* case and the implication it bears for a general right to edit on the part of students editors of state-supported publications. The question thus becomes one of competing first amendment interests, and the search must be for a reconciliation between the interests, on the one hand, of student autonomy in control over the contents of the newspaper, and, on the other, of nondiscriminatory public access to a communication forum sponsored by the state.

### D. A Reconciliation of Competing Interests.

I think that the two interests discussed above can be accommodated through a doctrine which permits student editors of state newspapers unfettered discretion over what might be termed the "editorial product" of the newspaper, yet requires that when the newspaper devotes space to unedited advertisements or announcements from individuals outside the newspaper staff, access to such space must be made available to other similarly situated individuals on a nondiscriminatory basis.

I use "editorial product" to comprehend the news and editorial columns of the paper, and other sections that by tradition and popular perception would be subject to editorial input from the operators of a newspaper. Guest columns and letters to the editor, although closer to the borderline because of the authorship, probably would be included in this "editorial product" notion.[31]

As to the sections of the newspaper which would be subject to the requirement of nondiscriminatory access, I take the two sections of the *Reflector* at issue in this suit to be paradigmatic. According to the allegations of the MGA, the sections of the *Reflector* to which access was sought were regularly available to local organizations for announcements and messages of social, political and informative natures.[32] Also, the student editors apparently do not purport to exercise editorial responsibility over the issues raised by or the content of these paid advertisements and unpaid announcements. No one would be likely to confuse statements appearing in them as officially endorsed by the students or the school.[33] Were there any problems in this regard,

---

**31.** The location in the newspaper of guest columns and letters to the editor, as well as the perception that more of each may be submitted than editors care to print, supports an assumption that the editors at least choose what issues are to be discussed, if not what statements are to be made. Again, I do not consider whether a demand for "minimum access" might be strengthened by a student newspaper's regular acceptance of letters to the editor.

**32.** In deciding whether a public facility should be considered to be a public forum, we have used the following standard:

The crucial query is whether or not the particular public facility involved in this litigation constitutes an appropriate place for the exercise of First Amendment rights. In order to answer this issue we consider the following factors relevant:

"does the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for

communication of views on issues of political and social significance."

*Wolin v. Port of New York Authority,* 2 Cir. 1968, 392 F.2d 83, 89, cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275.

*Southeastern Promotions, Ltd. v. City of West Palm Beach,* 5 Cir. 1972, 457 F.2d 1016, 1019.

**33.** This case could perhaps be analogized to the situation of a large bulletin board centrally located in the student union building. Suppose school officials have left control of the board to a student group selected by other students. Suppose these students then determine that the major portion of the board is to be given over to thematic displays on selected topics of student interest, to be designed by the elected student group each week. Suppose further that the remainder of the board is to be used by anyone wishing to present a message of any kind to students generally. Perhaps the MGA could not require that it be allowed to present a display in the major portion of the board, but I doubt that the MGA could constitutionally be prohibited from posting an announcement on the "open forum" section of the bulletin board.

clear disclaimers as to the source of the messages easily could be added.[34]

I want to emphasize that the right of equal access I would invoke could, for the purposes of this case, be carefully circumscribed.[35] For example, the newspaper could perhaps provide access only to students or other members of the university community and not be guilty of content discrimination.[36] Perhaps access could even be restricted to local community businesses and groups.[37] The possibility of various source restrictions need not be reached in this case, however. The allegations of the plaintiffs suggest that other local groups, similarly situated to the MGA, were allowed access to the advertising and "briefs" sections of the paper. If that is true, impermissible content discrimination will have been shown—the "state" cannot accept advertisements from some local groups and refuse those from others because of their content.

Conceivably, other limitations on the envisioned right of equal access could arise in response to logistics and cost. A state newspaper which had provided a public forum for the publication of any message from anyone could in one week receive thousands of proposed messages on the same subject. It may not be feasible to print them all.[38] A word-per-message limitation might be useful, but situations still might exist in which there were simply too many similar messages to print. If the "public forum" is to remain that, some content neutral means of selection would become necessary—e. g., requiring payment of a reasonable fee,[39] printing the first however many submissions, or selecting statements at random. Again, we need not reach these questions to decide this case.

**34.** Cf. Bazaar v. Fortune, 5 Cir. 1974, 489 F.2d 225 (en banc).

**35.** An important modification on any right of access is the notion that certain categories of speech are constitutionally valueless, and thus may be legitimately suppressed on the basis of content. This "two-level" theory of speech has been subject to much criticism, see, e. g. Karst, supra note 16, at 31 ("The two-level theory is radically inconsistent with the principle of equal liberty of expression."); Kalven, "The Metaphysics of the Law of Obscenity," 1960 Sup.Ct.Rev. 1, 19, but the recent Supreme Court opinions cited in notes 6 through 12 indicate that the two-level theory is still with us. As demonstrated at the outset of this opinion, the MGA ad could not possibly be placed in any of the unprotected groups.

**36.** See Comment, "The Public School as Public Forum," 54 Tex.L.Rev. 90, 118–19 (1975). The state cannot, of course, arbitrarily discriminate in the recognition and access rights given to various student groups. See Healy v. James, 1972, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266; Gay Students Organization v. Bonner, 1 Cir. 1974, 509 F.2d 652. But see Gay Lib v. University of Missouri, W.D.Mo.1976, 1350 F.Supp. 416 [45 L.W. 2021, June 29, 1976].

**37.** Cf. Markham Advertising Co. v. State, 1968, 73 Wash.2d 405, 439 P.2d 248, appeal dismissed for want of a substantial federal question, 1969, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 512 (state statute may permit highway billboards to advertise businesses located in the neighborhood but not elsewhere).

Even broadly drawn and superficially content-neutral source restrictions may produce unjustifiable content discrimination. If the Radical Lawyer's Caucus can demand and acquire access to the State Bar Journal, why cannot the Radical Doctor's Caucus do the same?

For a discussion of a "limited public forum" (limited according to general subject matter), see Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation, D.R.I. 1976, 417 F.Supp. 632 [44 L.W. 2577, June 9, 1976].

**38.** See A. Meiklejohn, Free Speech and Its Relation to Self-Government 25 (1948) ("What is essential is not that everyone shall speak, but that everything worth saying shall be said."); Karst, supra note 16, at 39–41 (criticizing Meiklejohn's position).

**39.** The scope of any "reasonable fee" restriction need not be closely marked in this case. The MGA has alleged in effect that the Reflector provided both a paid and an unpaid public forum. If both in its paid advertising and its free announcements the Reflector regularly published submissions from groups similar in form to the MGA, the MGA's claim might well be upheld as to both sections of the paper.

One danger in such a limitation on the right of access, of course, is that if the fee is too high, the right becomes one available only to the wealthy. This was a concern expressed in the Chief Justice's opinion in CBS, discussed in note 21, supra.

There is no indication that any other advertisements, or announcements in the "briefs" section, had ever been refused by the newspaper, or that any consideration of space limitations was relevant in the decision to exclude the MGA ad.

I mention these possible limitations on the right of equal access to a state student newspaper to illustrate how narrowly a decision in the instant case could be written, and how careful a court should be in delineating the scope of such a right. These factors are closely related, of course, to the notion that time, place and manner restrictions are permissible "provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 1976, —— U.S. ——, ——, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346. The best way for the regulating agency to demonstrate that its restrictions are not based on content is through the formulation of specific rules governing what will and will not be published. When no rules guide the decision to exclude a controversial message from what otherwise appears to be a public forum, the courts are properly very skeptical of any proffered justification for the exclusion.[40]

40. *See Southeastern Promotions, Ltd. v. Conrad,* 1975, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448; *Southeastern Promotion, Ltd. v. City of West Palm Beach,* 5 Cir. 1972, 457 F.2d 1016. Of course, explicit regulations may reveal that the state is clearly engaged in content discrimination, but, in any event, judicial review will have been facilitated. *See Erznoznik v. City of Jacksonville,* 1975, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125; *Police Dep't of Chicago v. Mosley,* 1972, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212. *But see Young v. American Mini Theatres, Inc.,* 1976, —— U.S. ——, 96 S.Ct. 2440, 49 L.Ed.2d 310 [44 U.S.L.W. 4999 1976.]

41. One other aspect of this case, closely related to the "state action" issue discussed above, would be troubling on remand. Bill Goudelock,

## CONCLUSIONS

I think it must be plain by now that I consider this a most difficult area of conflicting first amendment interests. It should also be plain that I am convinced that the majority has reached an erroneous conclusion, and has failed adequately to consider the difficult issues actually presented in the case. As I have indicated, I would hold that there exists in some situations a right to nondiscriminatory access to the advertising and announcement sections of state-supported newspapers. I would remand this case to the district court for findings on state action (the nature of the funding, and the extent to which the *Reflector* can fairly be characterized as the official newspaper of MSU), on the other types of advertisements and announcements carried by the *Reflector* and on the practice followed by the student editors in rejecting advertisements.[41]

One reason for extreme caution in suggesting the sort of rules I have envisioned in my dissent is the danger that the state may provide "nondiscriminatory" access by providing no access, at least through the student newspapers under consideration here. While that danger counsels sensitivity in insuring that the requirements placed on the student newspapers are reasonable, I do not think that it should deter the courts from requiring the equality of access which the first amendment has properly been read to guarantee. I am not so cynical as to

the former student editor of the *Reflector* and named defendant, has moved on to other endeavors. The plaintiffs have not attempted to substitute the successor editors as defendants in their official capacity. Arguably, then, the MSU officials are the only defendants against whom effective relief could be ordered. Are school officials to be ordered to keep hands off any decision made by student editors of student publications *except* when the decision is to refuse to publish some (but not all) advertisements from local groups, and in the excepted case are the officials to be ordered to compel the publication of all such ads? The result is not untenable, but it does sound a little strange. *Cf. Lee v. Board of Regents,* 7 Cir. 1971, 441 F.2d 1257. Declaratory relief would presumably be available against all defendants.

suppose that state school officials and student editors of state school publications would uniformly choose to permit no outside views to be expressed in their publications rather than to permit, in a designated section of the publication, a free and open discussion of public issues.

The accommodation of competing interests which I have tried to sketch in this opinion may seem, on the surface, to lead to anomalous distinctions, especially from the perspective of university officials. Students may not be censored in their decision to publish, nor countermanded in their fashioning of an "editorial product." Yet student editors may themselves be treated, in effect, as agents of the state in their dealings with the public. On close consideration, I feel, these lines are not anomalous

*Bazaar* and the other cases discussed above placed in student hands the right to be free of official censorship and, by implication, the right to edit. Neither *Bazaar* nor any other case, however, equips student editors of a state publication with the scyth of the censor to be used arbitrarily in cutting a few out of many submissions from the public. Although a bright line (e. g., student editors of state publications have all the rights of private editors) might be easier to draw, I believe that when each side of the balance is weighted with important constitutional interests, the court cannot abdicate its calligraphic responsibility to draw careful lines reflecting the optimum accommodation of rights.

The key to the reconciliation here is an emphasis in each situation on the powerful interests of speakers and listeners in free expression. In each context—officials attempting to censor students, and students attempting selectively to censor certain messages from the public on the basis of content—the court must balance the competing interests, but always with its thumb of the side of full and open discussion of public issues.[42]

For the reasons stated, I DISSENT.

42. See Kalven *supra* note 14.