**Donald E. MUIR, H. Jeff Buttram, and O. Navarro Faircloth, Plaintiffs-Appellants,**

v.

**ALABAMA EDUCATIONAL TELEVISION COMMISSION; Jacob Walker, etc., et al., Defendants-Appellees.**

No. 80–7546.

United States Court of Appeals, Fifth Circuit. Unit B

Sept. 21, 1981.

Rehearing En Banc Granted Nov. 16, 1981. See 662 F.2d 1110.

Thomas A. Clark, Circuit Judge, filed a dissenting opinion.

Edward Still, Birmingham, Ala., for plaintiffs-appellants.

Leitman, Siegal & Payne, P.A., Eddie Leitman, Andrew P. Campbell, Birmingham, Ala., for defendants-appellees.

Theodore D. Frank, Washington, D.C., for amicus Public Broadcasting Service.

Before MARKEY *, Chief Judge, HILL and THOMAS A. CLARK, Circuit Judges.

MARKEY, Chief Judge:

Appeal from a judgment of the United States District Court for the Northern District of Alabama refusing to order Alabama Educational Television Commission (AETC)

* Chief Judge of the U.S. Court of Customs and Patent Appeals, sitting by designation.

to broadcast the program "Death of a Princess" and granting summary judgment for AETC. We affirm.

## BACKGROUND

AETC decided not to broadcast "Death of a Princess", scheduled for broadcast in Alabama on May 12, 1980 at 8:00 p. m. The film, one of thirteen in the series "World," is a drama/documentary of events said to have surrounded the July 1977 public execution for adultery of a Saudi Arabian princess and her lover.

AETC, organized under Ala.Code § 16–7–1, is responsible for "making the benefits of educational television available to and promoting its use by inhabitants of Alabama" and has "the duty of controlling and supervising the use of channels reserved by the federal communications commission to Alabama for non-commercial, educational use". Ala.Code § 16–7–5.[1] To this end, AETC operates a statewide network of nine non-commercial, educational television stations licensed by the Federal Communications Commission (FCC) under the Communications Act of 1934 (47 U.S.C. §§ 151, et seq.). AETC is funded through state legislative appropriations from the Special Education Trust Fund, matching federal grants through the Corporation for Public Broadcasting (CPB), and private contributions.

AETC is a member of the Public Broadcasting Service (PBS), a non-profit corporation distributing public, non-commercial television programs to its members by satellite.[2] AETC is also a member of the Station Program Cooperative (SPC), a program funding and acquisition mechanism operated by PBS. Membership in SPC entitles licensees to participate in the selection and funding of national public television programs distributed by PBS. Respecting each such program, member licensees indicate whether they will contribute to the costs of purchasing the broadcast rights. Those refusing to contribute to a program's cost are precluded from broadcasting that program. Those agreeing to contribute are free to broadcast or not to broadcast the program. PBS's "Station Users Agreement", reposing in licensees the absolute right to select programs they will broadcast and to determine when they will broadcast them, accords with an FCC requirement that its licensees exercise exclusive control over selection of material for broadcast.

PBS's acquisition of "World" was funded by 144 public television licensees, including AETC, through the SPC. During the week before its May 12 scheduled broadcast, the showing of "Death of a Princess" was protested by Alabama residents citing fear for the personal safety and well-being of Alabama citizens working in the Middle East. On May 10, AETC announced its decision not to broadcast the film as scheduled.

Appellants, residents of Alabama who had planned to watch "Death of a Princess," brought this action on May 12, 1980 under the First and Fourteenth Amendments and 42 U.S.C. § 1983, seeking to compel AETC to broadcast the film and preliminary and permanent injunctions against AETC's making "political" decisions on programming.

In a well-reasoned opinion, Judge J. Foy Guin, Jr. explained: (1) that the likelihood of success on the merits criterion for an injunction had not been shown; (2) that the First Amendment protects the right of broadcasters, private and public, to make

---

1. The statutory provisions establishing AETC provide in pertinent part:

   § 16–7–1. Creation.
   There is hereby created an agency to be known as the Alabama educational television commission, hereinafter called the commission.

   § 16–7–5. Duties.
   The commission is organized for the purpose of making the benefits of educational television available to and promoting its use by inhabitants of Alabama ... The commis-

sion is specifically charged with the duty of controlling and supervising the use of channels reserved by the federal communications commission to Alabama for non-commercial, educational use. It may ... make rules and regulations governing the operation of such stations and the programs televised over such channels.

2. PBS filed a brief *Amicus Curiae* in the district court and in this court.

programming decisions free of interference; and (3) that viewers have no First Amendment right of access to the Alabama educational television network sufficient to compel the showing of "Death of a Princess." Accordingly, Judge Guin denied the motion for a mandatory order, denied a preliminary injunction, and granted summary judgment for AETC.

### Issue

■ Whether AETC's decision not to broadcast "Death of a Princess" violated Appellants' constitutional rights under the First and Fourteenth Amendments.[3]

### OPINION

Worthy but warring concepts are from the outset endemic when government acts not solely to govern but to fund and foster functions paralleling those conducted by its private citizens.[4] If, for example, the umpire sponsors a team, can the game's rules be applied equally to private and sponsored teams? Put another way, how may constitutional provisions designed to control the acts of those operating a government be applied to the acts of those operating a government sponsored television station? At the federal level, the pragmatic answer has been the adoption of legal and operational mechanisms limiting the federal government to a funding function and divorcing it from control over program content.[5] Those mechanisms have thus far permitted identical treatment under the Constitution of private and public broadcasters.[6]

In a very real sense, the presentation of competing first amendment interests here

---

**3.** The parties concentrated their briefs and arguments on First Amendment considerations and did not differentiate between the First and Fourteenth Amendments. In view of our holding and discussion, no useful purpose would be served by a detailed treatment of merely mentioned or potential arguments concerning primary FCC jurisdiction, a government speaker's right not to speak, due process elements in AETC's decision-making, federalism implications in federal court review of state-agency decisions, Appellants' standing, or prior restraint upon the film's producers who are not parties. Though *Amicus* PBS argues for our abstention in light of FCC's jurisdiction, resolution of conflict among the district courts of this circuit, see n. 21, and considerations of overall judicial economy, warrant treatment on the merits here. The text sets forth the basis for our agreement with the district court's conclusion that Appellants had not met the "likelihood of success on the merits" criterion for issuance of an injunction.

**4.** *See,* e.g., *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (municipal operation of utility); *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (state-approved price fixing among growers).

**5.** Whether "public" operation of communication media in a free society is wise, warranted, or workable is a matter within the province of the Congress, not the courts. It has not been shown to be unconstitutional. Of relatively recent vintage, operation of public television stations has grown in an atmosphere of continuous concern for avoidance of government control over program content. To date, "he who

pays the fiddler" has not apparently "called the tune". From the grant of the first noncommercial-educational TV license in the late 1940's, to today's 285 educational and public television stations, a growing recognition of the pervasive power of television has been reflected in efforts to divorce federal support from federal control. Insulation of the fund-dispersing CPB from political control in 1967, the creation of PBS and its limitation to interconnection and program distribution in 1969, and the formation of SPC in 1974, reflect a consistent effort to insure that program content selection remains in the hands of local public television stations. See, Blakely, *To Serve the Public Interest* (1979); The Public Broadcasting Act of 1967, 47 U.S.C. §§ 390–399; *The Broadcast Industry* (R. Stanley, ed. 1975); *Public Television: A Program For Action,* Report of the Commission on Educational Television, January, 1967.

**6.** The FCC requires that every broadcaster consistently maintain independent control over selection of programs as a condition to retention of a license. *E.g., Cosmopolitan Broadcasting,* 59 FCC 2d 558 (1976). 47 C.F.R. § 73.658(e), requires that every broadcaster reserve the right to reject any program offered to it. The FCC makes no distinction between private and public licensees, *Mississippi Authority for Educational Television,* 71 F.C.C.2d 1296 (1979), *City of New York Municipal Broadcasting System,* 56 F.C.C.2d 169 (1975). The right and duty of public broadcasters to choose their programs is clear also in the Public Broadcasting Act of 1967, § 396(a)(1)(B), and in its legislative history, S.Rep.No. 222, 90th Cong., 1st Sess. 7, 14, 15.

reflects the influence of emphasis. AETC and Amicus PBS emphasize the First Amendment's protection of a free press, of which the lifeblood is editorial freedom. Appellants emphasize the First Amendment's protection of free speech and their derivative right to hear.[7] The former, except in fairness doctrine cases, has to date prevailed with respect to all broadcasters. Whether it should prevail with respect to AETC in this case may be judged on whether the function challenged here was a governmental function.

Public and private broadcasters may be safely treated identically, in constitutional jurisprudence, if their functions under review be essentially identical. A focus on function, rather than on ownership or funding source, leaves room for both public and private broadcasters to operate. At the same time, a functional analysis would permit court enforcement of First Amendment protections in a case in which mere government ownership or funding had been metamorphosed into actual government content control.

■ The First Amendment is not a fetish. Revered it must be, but continued reverence requires that its applications be intelligible. A criterion for consistency is the recognition that the function to which the Amendment is applied may influence the result reached. If, for example, the function be government censorship of a newspaper, the Amendment forbids it. If the function be, as Mr. Justice Holmes put it, a false cry of "Fire" in a crowded theatre, it is not protected. At the same time, a myriad of functions—speaking, book publishing, theatre presentations, pamphleteering, and others—enjoy a proper presumption of protection under the First Amendment.

In the present case, the challenged function of AETC, in deciding to cancel "Death of a Princess", is not unlike that routinely performed by private broadcasters. Because Appellants concede that function to

private broadcasters, a functional analysis would appear to end the controversy at that point. Appellants' arguments, however, amount to a vigorous value-versus-value dichotomy deserving of response. Pointing to the presence of a state government as sponsor and partial source of funds for AETC, Appellants paint AETC as "government related" and its programming choices as "governmental action" and "governmental censorship".

### Editorial Freedom v. Censorship

Among the conflict of concepts here is that between an asserted right in Appellants as potential viewers to compel broadcast of "Death of a Princess" and an editorial freedom of AETC to independently select the programs it will broadcast. Solely because it is "owned" by a government, Appellants say AETC is bound by First Amendment restrictions against governmental censorship. The application of constitutional principles cannot, however, be controlled by the bare and barren fact that government plays some role.

■ Recognizing a unique role played by broadcast licensees in our jurisprudence, the Supreme Court has held that regulation of the broadcast media, because of its inherent physical limitations, presents "an unusual order of First Amendment values," *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973), (hereafter *CBS*). See also *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Broadcast frequencies are a scarce resource which must be parceled among applicants. Because all who desire to communicate cannot be satisfactorily accommodated, "it is idle to posit an unabridgable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Red Lion Broadcasting Co. v. FCC, supra* at 388, 89 S.Ct. at 1806. Delicate indeed is the

---

**7.** Appellants describe AETC throughout as "a government-owned television station". AETC describes itself as "a non-commercial broadcaster". PBS describes AETC as "a public broadcaster".

process of balancing First Amendment interests while determining what best serves the public's right to be informed, a process which must "necessarily be undertaken within the framework of the regulatory scheme [the Communications Act]." *CBS, supra* 412 U.S. at 102, 93 S.Ct. at 2086.

■ Under the Communications Act, both public and private broadcasters are licensed by the FCC to serve the public interest as public trustees. As such, each licensee has an obligation to perform a programming function responsive to the needs and interests of the community it serves and to insure that the public is presented suitable and varied social, political, and aesthetic ideas and experiences. As indicated above, the manner in which those obligated functions are discharged has to date been left to the editorial discretion of the licensee, whether public or private.

As Judge Guin noted, the Communications Act envisages the licensee as having the absolute right and nondelegable responsibility to select the programs to be broadcast. *CBS, supra.* AETC's decision to cancel the scheduled showing of "Death of a Princess" was thus an exercise of its obligation as a broadcast licensee to make its own programming decisions. If AETC had refrained from that exercise, it would have violated its statutory duty as a licensee.[8]

■ If, however, continuation of a right in public broadcasters to select their programs would violate Appellants' constitutional rights, the former could not prevail solely because it is statutorily authorized. Neither broadcast licensees nor FCC may operate in a constitutional vacuum. Indeed, as Justice Stewart indicated in *CBS*, the First Amendment exists to protect the

people from government, not vice-versa.[9] Hence, if government ownership and partial funding alone be synonymous with government censorship of program content, government ownership and funding would doubtless have to cease.

Public broadcasters, like private broadcasters, make decisions every day on which programs to broadcast. They do so not only as a matter of practical necessity but, as above indicated, in accord with their duty under the Communications Act. The inevitable result of the statutory scheme and the limited availability of broadcast time, is the licensee's rejection of some programs in favor of others. If initial rejection of some programs were considered a form of constitutionally forbidden censorship, every public television station would violate the Constitution with virtually every choice it made.

Whatever the programming choice made by a public broadcaster, our pluralistic society insures that unanimous public concurrence would be rare. It is true that the protections of the First Amendment relate most solidly to speech likely to prove controversial, universally approved speech having no need of protection. Yet it is inconceivable that Appellants could complain that their constitutional rights would have been infringed if AETC had initially declined to participate in financing the "World" series. It would demean the First Amendment to find that it required a public referendum on every programming decision made every day by every public television station solely because the station is "owned" and partially funded by a state government. It would be equally Draconian to hold on that sole ground that the

**8.** AETC once lost its license in part because it failed to maintain exclusive authority over all of its programming decisions. *Alabama Educational Television Commission,* 50 F.C.C.2d 461, at 464 (1975).

**9.** The First Amendment does not, however, preclude the government from speaking, *P.A.M. News Corp. v. Butz,* 168 U.S.App.D.C. 376, 514 F.2d 272 (D.C.Cir. 1975), or from exercising editorial control over its own medium of expression. *See, e. g., Wooley v. Maynard,* 430

U.S. 705 at 717, 97 S.Ct. 1428 at 1436, 51 L.Ed.2d 752 (1977); *Avins v. Rutgers, State University of New Jersey,* 385 F.2d 151 (3d Cir. 1967), *cert. denied,* 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968); *Advocates for the Arts v. Thomson,* 532 F.2d 792 (1st Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); *Network Project v. Corporation for Public Broadcasting,* 4 Med.L.Rptr. 2399, 2409 (D.D.C. 1979).

programming decisions of public broadcasters constitute government censorship, with the concomitant necessity of declaring that public television stations exercising editorial freedom are themselves constitutionally prohibited.

■ The present case originates at a point beyond the initial choice stages. AETC made the decisions to fund and accept the "World" series, to schedule "Death of a Princess" for showing on May 12, 1980, and to advertise that schedule. AETC then made a subsequent programming decision; it "changed its mind", and decided not to make the showing. Thus the issue on the present facts can be stated as whether a public television station may cancel an announced, scheduled program without violating the constitutional rights of viewers who were expecting to see it. In essence, appellants here assert a constitutional right to see every show appearing on a pre-announced schedule.

A decision to cancel a scheduled broadcast is obviously a programming decision, no less editorial in nature than the initial scheduling decision. No reason in fact or law appears for treating the former differently from the latter in this case. Whether applied to cancelling decisions or to initial scheduling decisions, court injunctions would implicate the same destruction of editorial freedom, the same excessive involvement of government and the courts in the editorial process, and the same impossibility of either editor or court pleasing an entire public.

Appellants' "censorship" argument is a recognition that the risk of reposing editorial freedom in government owned broadcasters lies in an obvious potential for government control of program content, in a word, for government use of its non-commercial, educational television station to perform the function of propagandizing the public. It is useful, in this context, to be reminded of the facts before us.

Raising the spectre of government control cannot serve the ends of justice if employed as determinative in a case involving no such control. AETC is operated by a commission. There is no allegation or indication that the commission is functioning in any manner as a propaganda arm of the government of Alabama. Though AETC receives some of its funds from the state legislature, its present operation could not survive on those funds alone. The matching amounts from CPB, see note 5 *supra,* and those from the public, are isolated from a "money talks" potential for controlling program content. There is no evidence here that the government of Alabama had anything whatever to do with AETC's decision.[10] In sum, the present record reflects no basis for a fear that the government of Alabama is "really operating the electronic press", *CBS,* 412 U.S. at 143, 93 S.Ct. at 2106.[11]

---

10. In *Mississippi Gay Alliance v. Goudelock,* 536 F.2d 1073 (5th Cir. 1976), the majority noted, 536 F.2d at 1075, that University authorities had nothing to do with a student editor's rejection of an ad submitted by the Alliance and upheld the free press right of editorial discretion. In an extended and scholarly dissent, Judge Goldberg viewed the editor's action as state action, pointed to the access provided to the student papers' advertising columns for ads from any source, and offered a reconciliation under which the content of sections devoted to news, editorial, guest columns, and letters could remain under editorial discretion, while access to space devoted to unedited advertisements and announcements would be accessible to all, subject to possible source and content-neutral limitations. Attractive as Judge Goldberg's reasoning is, we are denied its benefit here, where AETC has not opened its facilities to the public, for ads, announcements, or other-

wise, and appellants are not seeking to present their ads, announcements, or views, but are merely seeking to force AETC to present a show they want to see.

11. The concerns expressed in *CBS* by Justice Douglas, at 412 U.S. 149, 93 S.Ct. at 2109, and Justice Stewart, at 412 U.S. 143, 93 S.Ct. at 2106, about "the Government" were directed toward the presence of a federal regulatory agency, the FCC. If public broadcasting stations were considered "the government", solely because they are "owned" and partially funded by state governments, and the statements of concern in *CBS* were so applied as to enable any citizen to compel the showing of any program the citizen desired to see, public broadcasters could be precluded from making any choice of programs, which may in practice equate to forbidding their existence. In apply-

■ The district court found that AETC elected not to broadcast "Death of a Prin-cess" because it believed the showing posed a direct threat to the well-being of Alabama citizens in the Middle East, that is, that the showing would be contrary to the "public interest." Appellants have not shown that finding to have been erroneous. Nor have they shown error in the finding that AETC's decision was independently made by the commission itself, and did not result from importunings of any government.

It is useful also to note that Appellants here are asserting rights as viewers desiring to see a scheduled film, thus seeking to force an unwilling speaker to speak. They are not seeking relief from a prior restraint of their own right to speak. Nor are they asserting that the film is a one-sided presentation of, or deals in any manner with, a controversial issue before the public. If appellants were asserting that the challenged decision dealt with issues of public importance, their claim would be under the fairness doctrine and would have to be lodged with the FCC, which has developed procedures amenable to accommodation of First Amendment conflicts under that doctrine. See *American Security Council Education Foundation v. FCC*, 197 U.S.App.D.C. 124, 607 F.2d 438 (1979) (*en banc*), *cert. denied*, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980). Respecting conflict between the right to hear and the right not to speak, even when government has the information sought, see *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), and *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978).

■ That a "public" television station is "owned" by a state government may be cause for concern, for vigilance with vigor, for seeking of safeguards. It may raise a possibility, even an opportunity, for government censorship. It is not itself censorship. Nor is it alone a talisman for application of First Amendment principles different from those applied to private broadcasters. Hence the naked fact of government ownership, from which appellants leap to the conclusion that every program rejection constitutes government censorship, is insufficient in itself to require denial of editorial freedom in this case to public broadcasters.

### Editorial Freedom v. Public Forum/Public Access

That the First Amendment protects the right of private broadcasters, subject to the fairness doctrine, to make programming decisions free of interference and public access was made clear by the Supreme Court in *CBS, supra*. In upholding the right of a private broadcast licensee to refuse editorial advertisements, the Court said:

> For better or worse, editing is what editors are for; and editing is selection and choice of material. That editors—newspaper or broadcast—can and do abuse this power is beyond doubt, but that is no reason to deny the discretion Congress provided. Calculated risks of abuse are taken in order to preserve higher values. The presence of these risks is nothing new; the authors of the Bill of Rights accepted the reality that these risks were evils for which there was no acceptable remedy other than a spirit of moderation and a sense of responsibility—and civility—on the part of those who exercise the guaranteed freedoms of expression.

*CBS, supra* 412 U.S. at 124–125, 93 S.Ct. at 2097.[12]

ing the First Amendment, we make no distinction between state and federal governments. The record does not establish, however, that AETC is an "agency" of either government, or that its programming decisions were in fact decisions of either government. It is unnecessary to determine, therefore, whether AETC must either operate as a public forum or cease operating.

**12.** Both parties quote segments of one or more of the six opinions supplied by the court in *CBS.* The quoted segments, standing alone, appear to support the position of the quoting party. From the six opinions, it is difficult to glean from any one in its entirety a majority view on all the issues. Though a majority clearly concluded that private broadcaster CBS

■ The First Amendment right set forth in *CBS* has been held to reside equally in non-commercial public licensees, such as AETC, who do not forfeit that right merely because they are publicly supported. *Community Service Broadcasting v. FCC*, 593 F.2d 1102 (D.C.Cir. 1978).[13] Thus AETC's refusal to broadcast "Death of a Princess" is itself constitutionally protected.

■ Nothing of record indicates that AETC must be considered a public forum to which Appellants have a constitutional right of access or in which Appellants have a constitutional right to compel the broadcast of "Death of a Princess." That the government "owns" or financially supports a speech medium does not alone create a public right of access to that medium, much less a public right to force that medium to present a particular film. *See Avins v. Rutgers, State University of New Jersey*, 385 F.2d 151 (3rd Cir. 1967), *cert. denied*, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968), and *Advocates for the Arts v. Thomson*, 532 F.2d 792 (1st Cir. 1976), *cert. denied*, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976). It is only when the government has created a public forum dedicated to public use that a right of access may obtain. The Supreme Court has recognized that "the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question." *Lehman v. Shaker*

*Heights*, 418 U.S. 298, 302, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974).

More recently, in upholding a statute prohibiting use of residential mail boxes for dissemination of unstamped literature, the Court cited its earlier recognition that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government". *United States Postal Service v. Council of Greenburgh Civic Associations*, —— U.S. ——, ——, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). That recognition appears in *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), and *Lehman v. City of Shaker Heights, supra*. Though none of the facilities involved in the cited cases was a public broadcast station, the principle for which the cases stand, namely that government ownership or control does not alone guarantee public access, is unaffected by that circumstance. Moreover, the Court pointed out, at —— U.S. at —— n.6, 101 S.Ct. at 2685 n.6, that use of an instrumentality for communication of ideas or information does not alone require that the instrumentality be declared a public forum, citing the presence of such use in *Lehman*.

The Court in *CBS* concluded that a right of public access was fundamentally inconsistent with the responsibilities imposed on broadcasters to serve the public interest,[14]

---

did not violate the Constitution in refusing the proffered advertising, the opinions contain varied comments respecting the relationship of a broadcasting facility to "the Government". In one opinion, CBS's decision was viewed as not constituting "governmental action", its refusal to accept the advertisements, "assuming governmental action", was held not violative of the First Amendment, and journalistic independence was described as incapable of existence if CBS's refusal were read as governmental action. In two concurring opinions it was pointed out that to read broadcaster action as governmental action would be to render broadcast stations public forums and strip them of their First Amendment rights. The dissent argued that CBS should be considered a public forum. No specific reference to noncommercial public

broadcasters like AETC appears in the opinions accompanying the Court's decision in *CBS*.

13. [N]oncommercial licensees are fully protected by the First Amendment. Clearly, the existence of public support does not render the licenses vulnerable to interference by the federal government without regard to or restraint by the First Amendment .... noncommercial broadcasters no less than their commercial counter-parts are entitled to invoke the protection of the First Amendment .... 593 F.2d at 1119.

14. "The result would be a further erosion of the journalistic discretion of broadcasters in the coverage of public issues, and a transfer of control over the treatment of public issues from the licensees who are accountable for broadcast performance to private individuals

and that a public right to demand that particular programs be broadcast would result in excessive and undesirable governmental intrusion.[15] In *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), the Court again stated that public access would conflict with the independence of individual licensees.[16] We can see no basis for abandoning or evading those conclusions with respect to public broadcasters, to the functioning of which those conclusions apply with equal force. Indeed, the radical therapy of regimentation foreseen as accompanying access in *CBS*, 412 U.S. at 124, 93 S.Ct. at 2097, would be no less radical when applied to public broadcasters.

That the functioning of a broadcast station is fundamentally inconsistent with the concept of a public forum which must be open to all distinguishes this case from

*Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), on which Appellants rely.[17] There the Court held that a municipal auditorium could not preclude the showing of the musical "Hair" because it found that the auditorium was a public forum dedicated to the public use as a "community center ... where civic, educational, religious, patriotic and charitable organizations ... may have a common meeting place." *Id.* at 549, n.4, 95 S.Ct. at 1242, n.4. There is an essential difference between a public broadcaster engaged in the private broadcaster function of selecting and presenting its own programs, and a municipal auditorium made available for presentations by others.[18]

*In Southeastern Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016 (5th Cir. 1972), another municipal auditorium case,

who are not. The public interest would no longer be 'paramount' but, rather, subordinate to private whim." *CBS, supra* 412 U.S. at 124, 93 S.Ct. at 2097.

15. Under a constitutionally commanded and Government supervised right-of-access system urged by respondents and mandated by the Court of Appeals, the [FCC] would be required to oversee far more of the day-to-day operations of broadcasters' conduct, deciding such questions as whether a particular individual or group has had sufficient opportunity to present its viewpoint and whether a particular viewpoint has already been sufficiently aired. Regimenting broadcasters is too radical a therapy for the ailment respondents complain of ...
The [FCC's] responsibilities under a right-of-access system would tend to draw it into a continuing case-by-case determination of who should be heard and when." *CBS, supra* at 126, 127, 93 S.Ct. at 2098, 2099.

16. The language of § 3(h) [of the Communications Act] is unequivocal; it stipulates that broadcasters shall not be treated as common carriers.... [Section] 3(h), consistent with the policy of the Act to preserve editorial control of programming in the licensee, forecloses any discretion in the [FCC] to impose access requirements amounting to common carrier obligations on broadcast systems. The provision's background manifests a congressional belief that the intrusion worked by such regulation on the journalistic integrity of broadcasters would overshadow any benefits associated with the resulting public access. 440 U.S. at 705, 99 S.Ct. at 1444.

17. Appellants also cite *Mink v. Station WHAR,* 59 FCC2d 987 (1976), wherein the FCC ordered a West Virginia radio station to file a plan stating how it would comply with the "fairness doctrine" by broadcasting programs related to strip mining. The fairness doctrine, codified in part at 47 U.S.C. § 315(a), imposes on broadcasters a duty to fairly reflect opposing viewpoints on public issues. That the FCC may, consistent with the First Amendment, limit the editorial discretion of its licensees by imposing a fairness doctrine was recognized in *Red Lion Broadcasting Co. v. FCC, supra. Mink* stands for no more than that and does not support the action plaintiffs would have the court take here, where the fairness doctrine is not involved.

18. The nature of facilities held to constitute public forums may be gleaned from the cases: bus terminals, *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968) *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968); airports, *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir. 1975), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); high school auditoriums, *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir. 1973); public libraries, *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); shopping centers, *Amalgamated Food Employees v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); and welfare offices, *Albany Welfare Rights Organization v. Wyman,* 493 F.2d 1319 (2d Cir. 1974).

this court said the "crucial query" was whether the involved "public facility" was "an appropriate place for the exercise of First Amendment rights", *Id.* at 1019, and gave as factors to consider the character and activity of the place, its essential purpose, and the population who use it. AETC is an appropriate place for the exercise of First Amendment rights. The issue here is "whose?" The character and activity of AETC, and its essential purpose, make clear that it is a place for exercise of the editorial function, that is, of AETC's free press right set forth in the Amendment. Except as viewers, no population uses AETC. Appellants seek, by demanding access, to create a population of users, a goal inconsistent with continued exercise by AETC of its First Amendment rights.

Appellants' insistence that public television stations be judicially declared public forums sounds a tone of *tour de force.* Unlike public parks, bus terminals, airports, public libraries, shopping centers, and municipal auditoriums, public broadcast stations do not function and have not functioned as public access places. Appellants distinguish other, non-public forums but government owned places, like a judge's chambers, courtrooms, and the U.S. Senate, from public broadcast stations on the ground that the latter are "speech related". See *CBS,* supra, 412 U.S. at 194–195, 93 S.Ct. at 2132–2133 (Justice Brennan dissenting); *United States Postal Service, supra,* —— U.S. at ——, 101 S.Ct. at 2688 (Justice Brennan concurring). As above indicated, that a public broadcast station is speech related and used for communications of ideas and information does not alone create a constitutional right in viewers to dictate program choices of public broadcasters solely because a state government "owns" the station, where the station has not been shown to be suitable for such dictation or to have been dedicated and used for expression of individual views. *See* Cass, *First Amendment Access to Government Facilities,* 65 Va.L.Rev. 1287 (1979).

Respecting program selection, the public forum argument presents the question "Who shall decide?" Converting public broadcasters into public forums may be a "good idea". Absent a constitutional imperative it is not for us to effectuate. In apparent recognition that chaos could accompany unlimited public access, Appellants would grant public television stations the right to impose what Appellants describe only as "reasonable limitations as to time, manner, and place". It is clearly feasible to design and impose such limitations with respect to some public forums.[19] Appellants make no suggestion, however, as to how we might impose such limitations on the unique function of broadcasting. Appellants do not tell us how many citizens would demand shows they want to see, and do not say which or how many hours per day or week would be adequate to meet that demand. Nor are we told whether any room should exist for AETC's own programs if demand for access exceeded the system's capacity; nor whether any AETC selection of its own programs, during any non-access time, would constitute censorship of programs rejected. No suggestions appear respecting the manner of acquiring access, whether it should be "first come, first served", whether AETC should have any right to preview access programs, whether AETC could refuse to broadcast an access program it considered obscene or duplicative or otherwise not in the public interest, or whether the state would defend AETC's commission in suits based on their having allowed this or refused that access program. No suggestion is made regarding AETC's retention of its license after its violation of FCC regulations requiring it to exercise its own editorial judgment. That incomplete list of access parameters in broadcasting is sufficient to indicate the inappropriateness of a conversion of public broadcasting stations into public access places by judicial fiat in this case.

---

**19.** See Judge Goldberg's reconciliation recommendations in *Mississippi Gay Alliance, supra* note 9, and the discussions of public forums in the cases listed in note 18 *supra.* With suffi-

cient channels and technical equipment available, some cable TV operators have voluntarily provided public access channels and two-way communication capacity.

### Editorial Freedom v. Basis of Choice

Appellants, contending that if AETC has freedom to make editorial decisions those decisions must not be political, argue that AETC's decision not to broadcast "Death of a Princess" was based solely on political considerations, an act of political censorship in violation of the First Amendment.

The editorial process is inherently subjective. To posit a general proscription against "political" programming decisions would vacate the statutory obligation of broadcasters to "cover" political events and public affairs. Further, it would necessarily involve unacceptable and undesirable judicial intrusion into the editorial process. A decision appearing to some persons as serving the "public interest" may well appear to others as "political".[20] To force broadcasters, in making their required public interest determinations, to consider whether each could be justified in a court of law, would be inconsistent with the entire statutory scheme. Similarly, if viewers, whose perceptions and perspectives necessarily differ, could challenge programming decisions on such basis courts would be repeatedly called upon to enter an anti-free press quagmire, where they would then attempt to determine whether "political" considerations were present in programming decision after programming decision. Such a result is not only undesirable, it is constitutionally prohibited. See Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

Whatever may be said of a general proscription, the district court's finding in this case that AETC's decision was based on its view of the public interest, namely a concern for safety of Alabama citizens in the Middle East has not, as above indicated, been shown to have been clearly erroneous. Coupled with a total absence of importuning of AETC by government officials, that finding defeats plaintiffs' argument concerning the basis for the challenged decision.[21]

### Editorial Freedom v. Judicial Intervention

A grant of Appellants' demand for an order compelling AETC to show "Death of a Princess" would on the present record constitute an unwarranted judicial foray into an area in which editorial not legal judgments are required.[22] In CBS, the Supreme Court stated that the right of viewers is paramount, 412 U.S. at 102, 93 S.Ct. at 2086, but went on to state that governmental power will be asserted "only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters," Id. at 110, 93 S.Ct. at 2090, and that the access there sought would subject the public interest in coverage of public issues to "private whim". Id. at 124, 93 S.Ct. at 2097. The Court was there dealing with a private broadcaster

---

**20.** Public television is assertedly watched by more than half the nation's viewers every week. Letters, The Washington Post, A18, June 6, 1981.

**21.** Appellants attack the reality of AETC's expressed concern, pointing to post-decision indications that Alabama citizens in the Middle East might not have been endangered. If there were error as to the facts underlying an editorial decision, it would not render that decision "political". A mere conjecture (that AETC's decision may have been a "political" effort to please the Saudi Arabian government) cannot form a basis for the mandatory injunction sought. The commission received protests within a week of the scheduled May 12 broadcast. The commission itself made the cancelling decision on May 10, on the basis of information then available. Plaintiffs' argument that Alabama should establish and publish editorial policies and an editorial decisionmaking procedure should be addressed to the Alabama legislature. Absent a violation of the Constitution, courts should refrain from imposing a bond of judicial oversight. But see Canby, "The First Amendment and the State as Editor: Implications for Public Broadcasting", 52 Tex. L.Rev. 1123 (1974).

**22.** No court has granted a final order compelling a broadcast on the basis here sought. In Barnstone v. University of Houston, 487 F.Supp. 1347 (S.D.Texas, 1980) the court ordered a public broadcast station, KUHT–TV, to broadcast "Death of a Princess". On emergency appeal, this court vacated the order. Mr. Justice Powell denied a request to vacate this court's order and reinstate that of the district court. Barnstone v. University of Houston, 446 U.S. 1318, 100 S.Ct. 2144, 64 L.Ed.2d 488 (1980).

and the effort to require CBS to broadcast a supplicant's own editorial advertisement. Yet the hierarchy of interests it expressed is even more applicable here, where appellants seek to force the showing of someone else's film they want to see. Appellants have not shown that the public interest would be served by a holding that the paramount right of viewers requires judicial intervention to order broadcast of a program desired by some viewers and protested by other viewers. On the contrary, and absent such a showing, the public interest would appear to lie in leaving undisturbed the present modus operandi, in which responsibility and accountability for editorial decisions are reposed with those best positioned and qualified to make those decisions, the licensed broadcasters operating within the boundaries of the Communications Act and the fairness doctrine.

If there be logic in the law, and if a person could use the courts to compel the broadcast of a program solely because that person desired to see it, as Judge Guin pointed out, another person could use the courts to enjoin the broadcast of that program solely because that person considered it objectionable. The latter, a prior restraint so founded, would be constitutionally impermissible. It should be remembered that in broadcasting every compulsion carries constraint, every compelled program necessarily replacing and thus restraining the program that would otherwise have been chosen.[23] Courts are not equipped, staffed, or trained to meet the public interest by choosing among the programming interests to be served. Converting courts into super-editors, in derogation of the

press freedom guaranteed by the First Amendment, would be not only unprecedented, unwise, and unwelcome; it would be unconstitutional.

Moreover, the breadth of judicial intervention here sought is unnecessary. Public broadcasters do not operate unseen. They are dependent on public support, and must meet their obligations as licensees under the Act. As the Court said in *CBS*, "*Every licensee is already held accountable for the totality of its performance of public interest obligations.*" (emphasis added). 412 U.S. at 121, 93 S.Ct. at 2095.

### Alternate Forum

Though we decline to replace AETC's editorial discretion with our own, or with Appellants', a forum does exist for consideration of Appellants' grievances. Our election not to dismiss or stay the appeal in response to Amicus PBS's assertion of primary FCC jurisdiction, *supra* note 3, reflects no denigration of that forum and no suggestion that complaints similar to Appellants' should not in future be directed there.

Under the Communications Act, broadcast licenses are renewable every three years, at which time the FCC must review the licensee's overall performance to determine whether "the public interest, convenience and necessity would be served" by renewal. Provision is made for public participation. 47 U.S.C. § 309. Additionally, the FCC may at any time, upon public complaint or sua sponte, review the programming selections of its licensees to ascertain whether they are complying with

---

**23.** The concern over the free speech relationship of prior restraint and prior compulsion is not mentioned in Appellants' briefs. In support of the concept that courts may grant the order sought (which Appellants described as enforcing a First Amendment prohibition of "censorship" against public broadcasters) Appellants cite *Southeastern Promotions v. Conrad*, 402 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal auditorium), *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (state law against teaching Darwinian theory), and *Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963 (D.C.Cir.

1977) (suit against CPB and presidential aids, alleging censorship of PBS). The cases cited are clearly distinguishable on their facts. Appellants do not explain why, if their views on the compulsive power of courts against public broadcasters, and on public access to AETC's facilities, were adopted, a court would not have been required to consider an injunction *against* a showing of "Death of a Princess" if the protesters here had gone to court instead of to AETC. Appellants' briefs are replete with fairness doctrine parlance, though Appellants are apparently aware of the inapplicability of that doctrine in this case.

the requirements of the Communications Act. § 308(b).

Indeed, FCC routinely reviews claims of the type pressed upon us, namely that programming judgments had been made improperly, deceptively, or in bad faith. *See, e. g., KMAP, Inc.,* 72 F.C.C.2d 241 (1979) (suppression of news concerning United Farm Workers Movement); *Right to Life of Louisville, Inc.,* 59 F.C.C.2d 1103 (1976) (refusal to broadcast photographs of live fetuses in womb); *RKO General, Inc.,* 46 F.C.C.2d 240 (1974) (failure to air program about Passover); *Representative Patsy Mink (WHAR),* 59 F.C.C.2d 987 (1976) (failure to broadcast strip mining program); *William Harsha,* 31 F.C.C.2d 847 (1971) (refusal to allow George Jessel's criticism of "The New York Times" and "The Washington Post"); *Mrs. Alexandra Mark,* 34 F.C.C.2d 434 (1974), *aff'd, Mark v. FCC,* 468 F.2d 266 (1st Cir. 1972) (refusal to allow comments concerning astrology and astrological sign reading); *Citizens Communications Center,* 25 F.C.C.2d 705 (1970) (refusal to air intimate scene between Black and White actors); *Letter to Richard L. Ottinger,* 31 F.C.C.2d 852 (1970) (editing of remarks on Chicago conspiracy trial); *Gross Telecasting, Inc.,* 14 F.C.C.2d 239 (1968) (news slanting for private interests of licensee); *Tri-State Broadcasting Co., Inc.,* 59 F.C.C.2d 1240 (1976) (alleged news distortion to promote interests of advertisers); *Public Communications, Inc.,* 49 F.C.C.2d 83 (1974) (deletion of reference to product in entertainer's monologue); *Screen Gems Stations, Inc.,* 46 F.C.C.2d 252 (1974), *recon. denied,* 51 F.C.C.2d 557 (1975) (broadcast of Sugar Bowl would be contrary to public interest because the game discriminates against Blacks); *Columbia Broadcasting System (Mobile Homes),* 43 F.C.C.2d 1266 (1973) ("60 Minutes" segment on mobile homes failed to disclose CBS's interest in a Florida development); *Mark Lane,* 37 F.C.C.2d 630 (1972) (deletion of remarks in discussion of Viet Nam War); *National Broadcasting Company (Chet Huntley),* 14 F.C.C.2d 713 (1968) (Chet Huntley commentary re: Wholesome Meat Act of 1967 failed to disclose his ranching interests); *Station KTYM (Anti-Defamation League),* 4 F.C.C.2d 190 (1966), *aff'd,* 403 F.2d 169 (D.C.Cir. 1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969) (broadcast of allegedly anti-Semitic remarks); *Bernard Hanft,* 14 F.C.C.2d 364 (1968) (failure to cover department store picketing); *Columbia Broadcasting System (WBBM–TV),* 18 F.C.C.2d 124 (1969) (allegation that "pot party" documentary was staged by broadcaster); *Columbia Broadcasting System (Poor People's Campaign),* 17 P & F Rad. Red.2d 843 (1969) (coverage of Poor People's Campaign allegedly slanted and staged); *Radio Station WSNT, Inc.,* 27 F.C.C.2d 993 (1971) (failure to cover Black organization's activities); *Time-Life Broadcast, Inc. (KOGO–TV),* 33 F.C.C.2d 1050 (1972) (allegations of "Anglo bias" in the news); *Hunger in America,* 20 F.C.C.2d 143 (1969) (documentary allegedly misleading and staged); *Lincoln County Broadcasters, Inc.,* 51 F.C.C.2d 65 (1975) (broadcast critical of zoning decision for political reasons). Congress has armed the Commission with an arsenal of remedies for correction of programming misjudgments without resorting to censorship. Among the remedies employed in the cited cases are: admonishment of licensees for irresponsible programming judgments; imposition of a forfeiture for programming inconsistent with the public interest; declaration that licensee has failed to comply with FCC policies; issuance of a "short term" renewal; designation of license renewal application for full evidentiary hearing; and denial of license renewal. With the expertise thus developed by the FCC, and with its many available remedies, including the ultimate weapon of license denial, no reason appears for subjecting the crowded dockets of the courts in the first instance with the myriad of complaints reflected in the cited cases. Jamming the courthouse door with such claims can only serve to delay or deny access to the courts by those who must seek their aid.

Casting a claim in constitutional terms does not automatically render the FCC an inappropriate forum to consider it. As above indicated, FCC's procedures in re-

sponding to claims that a licensee is obligated to present a particular program fully recognize and accommodate competing First Amendment interests. *See American Security Council Education Foundation v. FCC, supra.* The Supreme Court has described the Communications Act as "drawn from the First Amendment itself" and has pointed out that "the public interest standard necessarily invites reference to First Amendment principles." *CBS, supra,* 412 U.S. at 122, 93 S.Ct. at 2096.

### Conclusion

AETC's refusal to broadcast "Death of a Princess" was a legitimate exercise of its statutory authority as a broadcast licensee to make its own programming decisions and is protected by the First Amendment guarantee of freedom of the press. That AETC is publicly-funded, or may be described as "government owned", does not alter that result in this case. Because Appellants have no constitutional right to compel AETC to broadcast "Death of a Princess," the district court properly awarded summary judgment to AETC.

AFFIRMED.

THOMAS A. CLARK, Circuit Judge, dissenting:

The majority's opinion is fatally flawed by its failure to recognize the constitutionally mandated differences in the scope of editorial discretion of *public* and *private* broadcasters. In the present case, contrary to the majority's view, there is state action that censors a particular viewpoint. I would hold that when a public broadcaster cancels a scheduled program on the basis of the program's content, unless the procedural guidelines established in *Freedman v. Maryland*[1] are followed, the state commits an act of censorship that runs afoul of the First and Fourteenth Amendments. In the instant case, the majority condones censorship by a state-government agency. By permitting the State of Alabama to deny a public viewing of a controversial program, our court swims against a stream of precedent and a philosophy that goes to the roots of one of our most cherished freedoms.

---

1. 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

The most elaborate discussion of First Amendment rights as applied to television is found in *CBS v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). It must be remembered that the broadcasting medium involved in that case was privately owned, not governmentally operated and controlled. The following two excerpts from the opinion of Chief Justice Burger provide the backdrop for my concern about the majority opinion:

> Although the broadcaster is not without protection under the First Amendment, *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260 (1948), *"[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount . . . .* It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC." *Red Lion, supra,* [395 U.S. 367] at 390, 89 S.Ct. [1794] at 1806 [23 L.Ed.2d 371].

*CBS v. Democratic National Committee,* 412 U.S. at 101, 93 S.Ct. at 2086 (emphasis supplied). The Chief Justice, in referring to the beginning of governmental regulation of the broadcasting industry, quotes the following statement given by then Secretary of Commerce Herbert Hoover in testimony before a House committee:

> "We can not allow any single person or group to place themselves in [a] position where they can censor the material which shall be broadcasted to the public, nor do I believe that the Government should ever be placed in the position of censoring this material." Hearings on H.R. 7357 before the House Committee on the Merchant Marine and Fisheries, 68th Cong., 1st Sess., 8 (1924).

*CBS v. Democratic National Committee,* 412 U.S. at 104, 93 S.Ct. at 2087.

The vision of the majority is obscured, in my opinion, in two respects. First, the ma-

jority believes that the editorial discretion that may be exercised by this state-controlled broadcast network is as constitutionally broad as that enjoyed by a private licensee. Second, building on that premise, the majority then concludes that no constitutional difference exists between the decision to broadcast and the decision to cancel, and that whatever the character of the decision challenged here, it does not raise a constitutional issue.[2] My own view is that whenever a state agency supervises broadcast programming, even when it holds the broadcast license, it may not discriminate between points of view on issues of public controversy.

To begin with, state action is present in the decision of the Alabama Educational Television Commission (AETC). The licensee is a creature of the State of Alabama, not the FCC, and is run by persons holding public office under Alabama law.[3] For me the answer to the question of state action is no different in this case than it would be if the licensee were alleged to have engaged in a systematic censorship of all views aired under its auspices that were, for instance, contrary to those of the political party of a controlling majority of the members of the Commission. If such were the allegations

here, the plaintiffs would not have to wait idly by while the FCC, in a lengthy hearing procedure, decided whether such conduct was consistent with a public broadcaster's obligations. Section 1983 would reach the actions of these persons acting under color of state law. It does so here.[4]

In dissenting, I limit my views to the facts of this case. AETC had purchased "Death of a Princess" as part of a package distributed through the Station Program Cooperative (SPC). As a member of SPC, the AETC had participated in the editorial decision to program "Death of a Princess" and had contributed to the funding of its broadcast by the Public Broadcasting System. As pointed out by the majority, AETC had the right to refrain from showing the program, notwithstanding its participation in the selection and funding of the program. It is that contractual right coupled with what the majority describes as the editorial freedom to choose its own programs that permitted AETC in this instance to cancel the showing of "Death of a Princess" two days before its scheduled broadcast. Remember that the decision by AETC not to show this controversial program was not grounded upon a reasonable

2. I also confess to some difficulty in understanding how a state-controlled broadcast network, at least with respect to claims of discriminatory access, is not in any sense a public forum.

3. *Ala.Code* §§ 16–7–1 to –5 (1975).

4. *CBS v. Democratic Nat'l Comm.*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), upon which the majority so heavily relies, does not support today's decision. In that case only three justices were of the view that the actions of *private* network broadcasters were insufficiently attributable to the government for the First Amendment to apply (Burger, C.J., joined by Stewart and Rehnquist, JJ., 412 U.S. at 114–21, 93 S.Ct. at 2092–96). Three justices were of the view that, assuming the broadcasters' actions were attributable to government through licensing and regulation by the FCC, the policy of private broadcasters of denying paid political ads on demand did not violate the First Amendment. (White, J., and Blackmun, Powell, JJ., concurring, 412 U.S. at 146–48, 93 S.Ct. at 2108–09.) Those justices accepted the FCC's determination, and Congress' through its enabling legislation, that alternative formats

would suffice to keep what was assumed to be a government function content neutral. Two justices (Brennan and Marshall, JJ., 412 U.S. at 170, 93 S.Ct. at 2120) were of the view that the private broadcasters' actions *were* comparable to those of the government that regulated them, and that the fairness doctrine was a constitutionally inadequate substitute for the right of access asserted. No one can read the whole of the decision, however, and find any support, express or implied, for a broadcaster's content-based editorializing that is dictated by a state agency. That problem simply was not present. In that case, as the majority concluded, the question was "not whether there is to be discussion of controversial issues of public importance on the broadcast media, but rather who shall determine what issues are to be discussed by whom, and when." 412 U.S. 130, 93 S.Ct. at 2100. The majority would have the reader believe that that is the issue here as well. But the issue here is whether a state agency may determine that there will be *no* discussion of a controversial issue of public importance by licensees subject to its control.

judgment that a substitute program better fitted the needs of the television viewers.[5] The decision made by AETC was to censor this particular episode in the *World* series, a decision to deny the public a viewing of what the Commission assumed to be a sensitive program. To make a conscious decision to prevent the public from viewing or hearing a program and to select a "filler" as a substitute merely to consume the time initially allocated for the deleted program plainly amounts to a "prior restraint."

The majority melds its erroneous construction of the facts with its misinterpretation of the law when it concludes that a state broadcaster's decision to cancel a program is conceptually indistinguishable from the most mundane programming decisions:

> A decision to cancel a scheduled broadcast is obviously a programming decision, no less editorial in nature than the initial scheduling decision. No reason in fact or law appears for treating the former differently from the latter in this case. Whether applied to cancelling decisions or to initial scheduling decisions, court injunctions would implicate the same destruction of editorial freedom, the same excessive involvement of government and the courts in the editorial process, and the same impossibility of either editor or court pleasing an entire public.

Majority opinion, page 1018. This reasoning simply is not convincing to me. The decision to schedule a program is a completely different animal from a subsequent decision to cancel it, if the decision to cancel has any element of official censorship. Censorship is a conscious decision to exclude the public from exposure to facts or opinions because the governmental decisionmaker deems such exposure harmful.

With respect to governmental operation of television or any other media form, the scope of editorial freedom must differ from that accorded the private media. The freedom of the private media cannot be abridged by the government. When the government operates a form of the media, however, it is not free to pick and choose between views on issues of public controversy. For the limited purposes required by the facts of this case, I would hold that once a program is selected for viewing in the manner done here, it cannot be replaced by action of a state agency unless the decision is made for reasons unrelated to the content of the program replaced. The power of censorship—the power to prohibit the public from knowing or seeing—in its slightest form should be denied to a state broadcaster.

The decision to cancel a program once it has been chosen for broadcast, as under these facts, should be subject to all the protections enjoyed by presumptively protected speech.

The settled rule is that a system of prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). In *Freedman* the Court struck down a state scheme for the licensing of motion pictures, holding "that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." 380 U.S. at 58, 85 S.Ct. at 739. We held in *Freedman,* and we reaffirm here, that a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: *First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third,* a prompt final judicial determination must be assured.

---

5. Nor was the decision based on any conclusion that the program's manner of presentation was in any way unfair, unbalanced, or non-objective, notwithstanding the difficulty of a judicial evaluation of such a defense. Instead the decision was based solely on its content as viewed by others. In effect, Alabama had supplied a surrogate censor for the Saudi regime.

*Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559–60, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975) (citations omitted). Through this process, a state broadcaster is given ample opportunity to demonstrate that a program's content is not protected speech.

The majority wrongly views the instant case as being one largely involving the right of access to a public forum. A public forum is not merely a place where anyone can go and, subject only to reasonable time, place, and manner restrictions, express any protected speech (although most places that have been regarded as public forums to date have that characteristic in common). Instead, it is at least any facility maintained or regulated by government that is "designed for and dedicated to expressive activities." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975). Only the highly varying characteristics of differing media (in *Southeastern Promotions* a municipal auditorium, while here a broadcasting network) render them distinguishable on the basis of any claimed rights of access. But this is no "right of access case," as the majority characterizes it; it is a discriminatory-access case. We need not decide, and I do not suggest, that a state-controlled broadcast network's status as a public forum gives rise to any affirmative right of access on the part of those interested in airing their own views by means of that forum. However, I think we must decide that a regulatory agency cannot selectively deny all access to discussion of an issue of public controversy except with regard to the time, place, or manner limitations of the forum itself. Even then, the agency may not consistently exclude one side of public controversy unless the message has already been given sufficient coverage through other means. A government broadcaster's editorial discretion must be, to the greatest extent possible, content-neutral. This cancellation flowed directly from a state agency's determination that the content of this program was unacceptable.

**6.** *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

I would prefer that the government not be in control of any form of the media. That decision is not left to me. Other members of the court and I are left with the responsibility of insuring that government's use of the media does not play favorites on issues of controversy. Besides the possible fear of an outside enemy, our greatest fear—like that of any people—is that of oppression by our own government. The framework of our government was designed by our founders to protect us from government. AETC's casual disdain for our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,"[6] although no doubt accompanied by sincere motive and infrequent occurrence, is no less repugnant to the Constitution than a studied design of thought control. I therefore dissent.